Filed 2/26/14  P. v. Dhillono CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

**(Sacramento)**

**----**

|  |  |
|---|---|
| THE PEOPLE, | C073107 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F03929) |
| v. | |
| RAVINDER SINGH DHILLON, | |
| Defendant and Appellant. | |

An amended information charged defendant Ravinder Singh Dhillon with making criminal threats that would result in death and great bodily injury (Pen. Code, § 422—count one)[1] and violating a protective order, a misdemeanor (§ 166, subd. (c)(1)—count two).  The information further alleged that defendant was convicted in 2006 of criminal

---

[1] Undesignated statutory references are to sections of the Penal Code in effect at the time of defendant's crimes.

threats (§ 422) within the meaning of sections 667, subdivisions (a) and (b) through (i), and 1170.12. As to count two, the information alleged that defendant was not eligible for county prison due to his prior. (§ 1192.7, subd. (c).)

A jury found defendant not guilty of criminal threats but guilty of the lesser offense of attempted criminal threats. (§ 664/422.) The jury convicted defendant of violating the protective order. Defendant admitted the prior.

Sentenced to state prison for eight years, defendant appeals contending the trial court abused its discretion and violated his due process rights in admitting propensity evidence. We reject defendant's contention and shall affirm.

## FACTUAL BACKGROUND

In 2003, R.K. married defendant. They have three children. At the time of trial (December 2012), a petition for dissolution of marriage was pending and R.K. had two restraining orders against defendant, one from Monterey County and the other from Sacramento County.

On June 3, 2012, defendant's parole agent, Jason Ciraulo, told R.K. that defendant was being released from prison. R.K. was concerned for her safety because defendant contacted her every time he was released from custody. Defendant was released between 6:00 and 8:00 a.m. that day. At 8:37 a.m., he called R.K. from a blocked number, identified himself, told her that he had been released, and that he was traveling on a bus or train. She recognized his voice. It was about three hours from the prison to Sacramento. He threatened, "I'm coming after you guys. I hope you know that. You guys have two hours to live." He also told R.K. that she and her boyfriend "are going to be dead" as well as everyone else living in the house. He also threatened to take their children. R.K. told defendant that she was contacting the police and telling her family. He responded that he did not give "an F" about the police and that he did not care

2

anymore.  R.K. claimed that she acted normally.  When she explained to him in a calm manner that she had a new relationship with someone she loved and was moving on with her life, defendant became angry and cursed at her.  The call lasted almost two minutes.

At 8:39 a.m., R.K. called her boyfriend and told him about defendant's threats.  To him, R.K. sounded frightened.  He planned to take her to the police department.  R.K. believed that she could not call 911 regarding defendant's threats because police officers had told her a few weeks before that if defendant was not at the residence, it was not an emergency.  She understood that she had to go to a police station or call the non-emergency number.

At 8:53 a.m., R.K. called Agent Ciraulo and left a message, stating that defendant had called and had threatened her and her family.  R.K. told everyone in the house (her brother, her father, and her children) that defendant had called.  She was sad, scared, and believed that her life was in danger.  She did not leave the house, believing that defendant would find her.  While R.K. was waiting for her boyfriend, her brother and her father stayed at the house.  R.K. spoke with her mother and sisters and told them that defendant had threatened her; R.K. sounded upset and frightened.

About 11:00 a.m., her brother heard R.K. screaming and cursing.  Inside the house, he saw her crying.  R.K. held a phone in her hand and said, "He's going to kill us."

About two hours after defendant called R.K., her boyfriend arrived at her house and took her to the police station but it was closed.  On the station door, a non-emergency number was listed.  R.K. called that number at 11:39 a.m., asking for help at her house.

At 12:58 p.m., Sacramento County Deputy Sheriff Mark Limbird went to R.K.'s house and took her statement.  She told the deputy about defendant's call.  She seemed

nervous and stated she was fearful of defendant, explaining defendant had assaulted her in the past.

At 4:00 p.m., defendant called R.K.'s mother to ask if she knew R.K.'s whereabouts.

That night, R.K. "stayed outside" and "looked around" for defendant, planning to call the police if she saw him. Her family members spent the night with her because they wanted her to be "extra safe."

In the morning of June 4, 2012, defendant had a scheduled meeting with Agent Ciraulo. Ciraulo arrested defendant when he showed up at 4:30 p.m.

The prosecutor presented evidence of defendant's prior acts of domestic abuse. In January 2005, defendant was angry, hit R.K. behind the ear, and also hit a glass table with his hand, shattering it and causing glass shards to fly into their four-month-old daughter's hair. He was arrested that day. When defendant was released from custody in March 2005, he went to R.K.'s house. He yelled at R.K. and told her that he was going to kill her, pushing her to the floor. R.K.'s sister called the police. In June 2005, R.K. and defendant reconciled.

Sometime thereafter, R.K. left defendant, taking their children to Monterey to live with her sister and her brother-in-law in a hotel which he managed. Defendant called and threatened to kill R.K. and their children and threatened her sister and her brother-in-law. On May 4, 2006, R.K. and her sister and brother-in-law filed a report with the police. Defendant was arrested in the hotel parking lot. R.K. was afraid and wanted to hide from defendant. The police arranged for R.K. and her children to live in a homeless shelter where they stayed for seven months.

In August 2006, a criminal protective order was issued in Monterey County. Defendant spent about a year in custody. When he was released, he contacted R.K. in

4

person. In 2008 or 2009, R.K. allowed defendant to live in her apartment when he was released from custody related to another incident.

In May 2011, R.K. lived with her parents as did her brother who was friends with defendant. Defendant visited often. R.K. described her relationship with defendant as married but separated. One day, defendant yelled at R.K., held her down, punched her 25 times behind her right ear, and fractured her middle finger. Defendant threatened to kill her if she told anyone. Later that day, defendant, armed with a firearm, threw R.K. against the wall, demanding sex. When she refused, he sexually assaulted her.

In August 2011, defendant arrived at R.K.'s house, went into her room, touched R.K. everywhere and demanded sex. When she refused, he pushed her on the bed where their children were sleeping, held her down, and sodomized her.

Between August 2011 and June 2012, defendant called R.K. from prison multiple times a day. In May 2012, defendant called her from prison and threatened her.

A criminal investigator for the Sacramento County District Attorney's Office testified for the defense. Five months after the current offense, the investigator spoke with R.K.'s sister who reported that R.K. had claimed that defendant called from jail and wanted to resume his relationship with her but she was not interested. When the investigator spoke with her brother, he did not report that R.K. claimed defendant had made threats. On cross-examination, the investigator stated that her sister also reported that R.K. had recounted defendant's threats against her and her boyfriend and that her brother also reported that he heard R.K. cursing, screaming, and yelling during the phone call with defendant.

With respect to the prior incident in August 2011, a patrol officer testified that he went to the house to investigate a verbal and physical fight. Defendant was arrested because he was a parolee at large, not because of a sexual assault or domestic violence.

5

As the result of the investigation, it was concluded that there had been a verbal argument but not a physical assault.

In prior testimony, R.K. stated that in August 2011, defendant wanted anal sex, she refused. She claimed that he "did it anyways," explaining that if she did not have sex with him, he would have hit her. She also claimed she was "forced" to have sex in May 2011.

## DISCUSSION

Defendant contends the trial court abused its discretion and violated his due process rights in admitting evidence of his prior acts of domestic abuse. We reject defendant's contention.

### I. Background

The prosecutor moved in limine to admit, under Evidence Code section 1109, evidence of defendant's prior instances of domestic violence from January and March 2005, May 2006, May 2011, August 2011, and April 2012. The prosecutor argued the current offense was an act of domestic violence—that is, threatening to kill his spouse and the mother of his children.

At the hearing on the motion, the court noted that an element of criminal threats was whether the victim was "reasonably in sustained fear for her safety and the safety of her immediate family." With respect to all the prior incidents, the court determined the acts were relevant under Evidence Code section 1109. The court found that the acts were a basis for R.K. to be reasonably in sustained fear that defendant would act violently because she "witnessed [defendant] acting violently as a result of anger towards her" (January 2005 incident); she was "the recipient of force by [defendant]" (March 2005 incident); defendant threatened to go to Monterey and kill the victim's sister if she refused to reveal the whereabouts of the victim and then "show[ed] up having made that

6

threat" (May 2006 incident); the victim had been "hit all over [her] body and threatened with a firearm," received injuries including a fractured finger, and was forced to have sex (May and August 2011 incidents); and she had been threatened by defendant when he called her (April 2012 incident). The court found the acts were more probative than prejudicial, finding that proof of the acts (other than the May 2006 incident) would not consume an undue amount of time and would not confuse the jury. Because R.K.'s sister was the victim of the criminal threats in 2006 (and R.K. the victim of stalking), the court determined that, to reduce any confusion, defendant's 2006 section 422 conviction would not be admitted unless the threats to the sister were in issue. The court excluded any mention of the stolen car and defendant's conviction for receiving stolen property in 2006.

## II. Analysis

Evidence Code section 1109, subdivision (a)(1) provides, in relevant part, as follows: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."

" ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' [Citation.] Section 1109 was intended to make admissible a prior incident 'similar in character to the charged domestic violence crime, and which was committed against the victim of the charged crime or another similarly situated person.' [Citation.] Thus, the statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation. [Citation.] Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the 'typically repetitive nature' of domestic violence. [Citation.] This pattern suggests a psychological dynamic

7

not necessarily involved in other types of crimes." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531-532, fn. omitted (*Johnson*).)

"By its incorporation of [Evidence Code] section 352, section 1109, subdivision (a)(1) makes evidence of past domestic violence inadmissible only if the court determines that its probative value is 'substantially outweighed' by its prejudicial impact. We review a challenge to a trial court's decision to admit such evidence for abuse of discretion." (*Johnson*, *supra*, 185 Cal.App.4th at p. 531, fn. omitted.)

" 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320 (*Bolin*).)

"Relevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s)." (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119 (*Rucker*).)

Here, admission of the prior incidents was not an abuse of discretion. The incidents were not remote in time nor were they any more inflammatory than the charged conduct of threatening to kill his spouse and the mother of his children. Notwithstanding defendant's claim to the contrary, defendant's prior conduct did not uniquely tend to evoke an emotional bias against defendant as an individual. (*Bolin*, *supra*, 18 Cal.4th at p. 320.)

Defendant argues the prior incidents with R.K. were "much more lurid and vivid" and the inflammatory nature alone should have compelled exclusion. He also argues that the majority of the evidence—R.K.'s testimony, the lengthy restraining orders, and cross-

examination—covered the uncharged acts of domestic violence. He claims the prior uncharged acts were, for the most part, dissimilar to the current offenses since the prior acts did not involve "touching" anyone but R.K., other than some glass shards which landed on their daughter. Defendant also claims the evidence was "cumulative, overly long, too time-consuming, inflammatory, and would lead the jury to want to punish [defendant]."

The probative value of the prior incidents of domestic violence was great in that the prosecutor was required to prove for criminal threats that R.K. was reasonably in sustained fear for her safety and the safety of her immediate family. Defendant had acted violently as a result of anger towards her over the years, hitting and pushing her, stalking her, threatening her, fracturing her finger, and forcing her to have sex. She had obtained two restraining orders against him. "Domestic violence is defined as including 'intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious injury to himself or herself, or another.' " (*Rucker*, *supra*, 126 Cal.App.4th at p. 1118.) Defendant's prior "domestic violence" was similar to the current "domestic violence" and reflects defendant's ongoing terrorization of the victim. While the prejudicial effect of the May and August 2011 incidents was increased by the fact that defendant was not convicted or punished for rape or sodomy (*id.* at p. 1119; *People v. Ewoldt* (1994) 7 Cal.4th 380, 405), the jury also learned that defendant had spent time in custody for various crimes. And the jury learned from defense evidence that defendant was not arrested for an act of sexual assault in August 2011 but instead for being a parolee at large.

Defendant claims "it cannot be shown beyond a reasonable doubt that the mountain of the inflammatory propensity evidence did not contribute to the verdict." We disagree. It is unlikely the jury disbelieved the evidence against him that he threatened R.K. in June 2012 but convicted him of the lesser offense of attempted criminal threats

9

on the basis of the prior domestic violence.  The court instructed the jury on the use of the uncharged acts, telling the jury not to consider the evidence for any purpose other than as it relates to whether "[R.K.] reasonably was fearful."  We presume the jury followed the trial court's instructions.  (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)  Indeed, the jury concluded defendant threatened R.K. but that his threat did not have its intended effect and convicted him of attempted criminal threats.

We do not find any error.  Having rejected defendant's claim, we also reject his argument that the admission of the propensity evidence violated his due process rights. (*People v. Falsetta* (1999) 21 Cal.4th 903, 913-915, 917; *People v. Johnson* (2000) 77 Cal.App.4th 410, 417-420.)

## DISPOSITION

The judgment is affirmed.

      BUTZ      , J.

We concur:

      BLEASE      , Acting P. J.

      ROBIE      , J.