Filed 12/9/14  P. v. Washington CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>VINCENT EARL WASHINGTON,<br><br>        Defendant and Appellant. | A138877<br><br>(Contra Costa County<br>Super. Ct. No. 05-12220011) |

**I.**

**INTRODUCTION**

Appellant Vincent Earl Washington, convicted by jury verdict of a domestic violence offense (Pen. Code, § 273.5, subds. (a), (e)), false imprisonment (§§ 236, 237, subd. (a)),[1] and dissuading a witness from reporting a crime (§ 136.1, subd. (b)), appeals on two grounds: that evidence of prior incidents of domestic violence was erroneously admitted under Evidence Code section 1109, and that the dissuading a witness count should have been dropped to a misdemeanor (§ 17, subd. (b)).  We reject appellant's arguments and affirm the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

1

## II.

## FACTUAL BACKGROUND

### A. Evidence of Domestic Violence Against Alleged Victim Danielle Carter

About 5:50 a.m. on September 10, 2012, police responded to a neighbor's report of a domestic quarrel between appellant and his girlfriend, Danielle Carter. Emauni Williams, Carter's 18-year-old next door neighbor, heard appellant order Carter to get back into the house, and Carter refused. Reine Turner, a friend who was spending the night with Williams, saw a woman approach the front door and saw someone drag her into the house by her upper body, although she could not attest it was Carter. Turner also heard someone hit someone else during the argument, but she did not report this detail to the police. Williams told the police these arguments were a recurring problem.

When the police went to Carter's home to investigate she admitted she had had an argument with her boyfriend, but she denied there was any physical violence. She did tell the officers, however, that she and her boyfriend were not getting along well and she was planning to leave him. The police checked on the safety of Carter's children and left.

Later that morning a "frantic" Carter arrived at the home of a friend in the neighborhood, Vicki McGhee, pounding on the door and asking to be allowed inside. She had her two children with her, the younger of whom was appellant's five-month-old baby.

McGhee allowed them inside and listened to Carter describe her fear that "this time" appellant was coming to kill her. Carter told McGhee appellant had beaten her that morning "like a dog," using his belt to strike her legs. Carter showed McGhee the fresh bruises and McGhee took cell phone photos. Carter also told McGhee appellant had hit her in the eye the week before but there were no visible injuries. Among other things, Carter told McGhee that appellant had fathered a child with another woman, and she was upset about it. McGhee suggested they call the police but Carter refused. "[Y]ou don't cross Vince," she said.

Carter continued receiving text messages while she was in McGhee's home and she read them to McGhee (although McGhee did not see them). Carter told McGhee

2

some calls were from appellant and some were from their friends telling her to call appellant and not to run off with his baby. McGhee advised Carter to stop reading the texts.

Carter wanted her mother to come pick her up, but she first wanted to go home to get some formula for her baby. Yet she was afraid to go home because she did not know if appellant was there, and he carried a nine-millimeter handgun "at all times." After about two hours, Carter decided to call the police and request a civil standby.

Deputy Alexandra Clark responded to the request. She was aware there was something going on in Carter's life because she had spoken to Carter's brother at the high school that morning. Clark also knew that a neighbor had filed reports with child protective services (CPS), questioning the children's safety, and CPS had initiated an investigation.

McGhee told Clark that Carter was suffering domestic abuse, but Carter did not want the police involved. After some persuasion by Clark and McGhee, Carter told Clark that appellant had hit her with a belt that morning during an argument in which he accused Carter of infidelity. She showed Clark the bruises on her legs. Carter said she was afraid of appellant because she thought he was using drugs and he carried a nine-millimeter handgun. Carter told Clark that appellant had threatened to kill her and harm her family members, and while Clark was present Carter received a text message from appellant in which he threatened to shoot the police if they showed up at her house.

After Carter's house had been cleared for safety, Clark accompanied Carter there to pick up some things for the baby. While they were in her home, Carter described for Clark the domestic dispute that morning, which had begun in the bedroom. Appellant threw a Windex bottle at Carter during the argument, but Carter was able to deflect it with her arms. When she tried to leave the bedroom, however, appellant blocked her way with his body. It was then that he took off his belt, folded it in half, and hit her legs with it multiple times. Carter got away from him and ran downstairs to the front door, but he followed her, and when she left the home he chased her and dragged her back in by the hair. Carter told Clark that appellant had been physically violent on about five prior

3

occasions.  Carter admitted to Clark she had told the police earlier in the day there had been no physical abuse.

After retrieving some things for the baby, Carter went back to McGhee's house and waited for her mother to arrive.  Carter took her children to her aunt's house to stay for a few days.

When the police later contacted Carter to discuss the crime, Carter began to cry and recanted the story she had earlier told Clark.  She claimed she had injured her legs by falling down in the garage and landing on a board.  Though the officer showed her how the welts in the photographs appeared to have been made by a belt, Carter stuck to her story that she had fallen on a board.  She refused to allow the officer to go into the garage to have a look at the board.

### B. Carter's Trial Testimony

When Carter testified at trial she recanted the stories she had earlier told Clark and McGhee.  She claimed she had made up the stories of abuse to get back at appellant because he told her he was leaving her for another woman.  She knew he had a criminal record and she figured if he was locked up in jail he could not cheat on her.  She described how she had fallen through a piece of plywood as she was getting some boxes down from a high shelf in the garage and had injured her legs as she extricated them from the broken piece of wood.

She also testified that when she took her children to McGhee's house she was just trying to get appellant "in trouble" and "make him pay" for hurting her.  She admitted telling McGhee that appellant had whipped her with a belt and that she was afraid he would kill her, but she claimed the stories were fabricated.  She also testified her phone battery was dead while she was at McGhee's house and denied receiving any messages from appellant.  Carter also had not wanted to repeat the false story of abuse to the police, but Clark "cornered" her and she confirmed the abuse after the police threatened to take away her children if she failed to report it.  She claimed it was the officer who refused to go look at the board in the garage, not she who refused him entry.

4

## C. Prior Incidents of Violence Against Kristen Dekker

Kristen Dekker testified for the prosecution under Evidence Code section 1109. She had dated appellant for about seven or eight years and had a daughter with him. They ended their relationship in 2010. Dekker was a reluctant witness.

Dekker's mother, Gerrie Dekker (Gerrie), also testified for the prosecution. Although she had never seen appellant hit Dekker, Dekker had told her about incidents in which appellant had struck her, and there had also been police reports of abuse. On one occasion Gerrie was in the car with Dekker and Dekker had appellant on her speakerphone. Gerrie heard appellant threaten to kill their entire family, so she got a restraining order against him.

In April 2007 appellant shoved Dekker, causing her to hit her head on the wall, which gave her a concussion and a black eye. She did not report the incident to the police because she was afraid of appellant. Gerrie noticed Dekker's black eye, but Dekker initially told her she had tripped and hit her face on a doorframe. Several months later Dekker told Gerrie that appellant had given her the black eye by shoving her against a wall. Dekker told the police about the incident in December 2007 when she called to report another threat by appellant, discussed below.

In November 2007, appellant struck Dekker in the face during an argument in his car over whether she was going to sleep at his house that night. Then he drove off with their child in the back seat. A neighbor called the police. Dekker told the responding officer that appellant had "slapped her or hit her in the face," and the officer noticed some redness there. But Dekker did not want to press charges. She also told the officer that appellant had abused her on seven other occasions. Gerrie later accompanied Dekker to the police station to talk to the police about the incident. Dekker told Gerrie appellant had threatened to kill her but she forgave him because she loved him.

Dekker also called the police in December 2007 to report that appellant, during a telephone conversation in which the question of child custody came up, threatened to kill her by hitting her in the head with a hammer if she took his daughter away from him. He said he might not kill her immediately, but he would catch her later and kill or disable

5

her. Dekker also told the police that throughout their relationship appellant had choked, punched and threatened to kill her. Dekker also related to the officer that in April 2007 appellant had shoved her into a wall, causing a concussion and a black eye, not previously reported to the police.

Dekker denied at trial that the prior police reports were true and denied that appellant gave her a black eye. She claimed she got the black eye in April 2007 by tripping on her shoelaces and hitting her face on a doorframe. With respect to the November 2007 incident, Dekker testified that she struck appellant first. She neglected to tell the police at the time that she was the aggressor because she wanted her daughter to be returned to her. She could not recall having told the police that appellant had also committed seven other incidents of domestic violence against her.

Dekker "guess[ed]" appellant did "[s]lightly" "lay hands on [her]" at some time during their relationship, but she always struck the first blow and appellant merely responded to her aggression. She did admit there was "prior fighting" between them in which appellant had pinned her arms in order to "control" Dekker's own aggression. But she testified that appellant never threatened to kill her or her family. Although she had contact with the police concerning domestic violence by appellant, she herself did not recall calling the police on him.

Appellant was prosecuted for the 2007 offenses, but Dekker refused to cooperate with the prosecution. Although she was subpoenaed, she never testified at that trial because appellant entered into a negotiated plea, which included admitting the domestic violence charges as misdemeanors.

### D. The Verdicts

After a six-day jury trial, appellant was convicted of the three crimes alleged to have been committed against Carter. He was sentenced to six years in prison.

# III.

## DISCUSSION

### A. Admission of Evidence of Domestic Violence Against Dekker

Prior to trial, there were cross-motions to admit and to exclude several instances of alleged domestic violence under Evidence Code section 1109.[2] The prosecutor sought to admit evidence of domestic violence committed by appellant against both Dekker and Tiffany Kimmons. In addition to the crimes against Dekker, discussed above, the prosecutor alleged appellant had slapped Kimmons on her left cheek during an argument. The prosecutor argued the evidence of all of the incidents of prior domestic violence should be admitted because the evidence showed appellant's pattern of controlling women and his "propensity" to commit domestic violence against his girlfriends.

Defense counsel countered that the prior incidents were inadmissible under Evidence Code sections 352 and 1109. He argued the incidents involving Dekker occurred in the context of a child custody dispute, the facts were complex and extremely prejudicial and included kidnapping, and the incidents involved two different women and multiple children. With respect to Kimmons, he argued there had been no conviction, the victim denied the incident, and admission of the evidence would result in a mini-trial within the trial.

After hearing argument, the court excluded the evidence of the alleged incident involving Kimmons under Evidence Code section 352 because the offense had not been prosecuted and Kimmons repudiated the report. However, the court ruled admissible the evidence regarding the various incidents involving Dekker, which was more similar to the present case and had resulted in convictions.

---

[2] Section 1109, subdivision (a)(1), provides as follows: "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

7

Appellant argues the testimony should have been excluded because (1) the prior incidents were not probative of the current offense and were not relevant to the charged crimes; (2) the evidence was more prejudicial than probative under Evidence Code section 352; and (3) the court failed to weigh probative value against prejudicial effect as required by Evidence Code section 352. He claims this was not only an evidentiary error, but a violation of the Fifth, Sixth and Fourteenth Amendments.

On the issue of admissibility the standard of review is abuse of discretion. (*People v. Hayes* (1990) 52 Cal.3d 577, 617; *People v. Johnson* (2010) 185 Cal.App.4th 520, 531 (*Johnson*).) Under that standard, we reverse only if the court's ruling "exceeded the bounds of reason," that is, if the ruling was "arbitrary, capricious, or patently absurd." (*Ceja v. Department of Transportation* (2011) 201 Cal.App.4th 1475, 1481.)

We reject out of hand appellant's claim that the past violence was "not probative of the current offense" and not "relevant to the charged crimes." Evidence of prior misconduct is generally inadmissible to prove a defendant's conduct on a specific occasion or to prove his predisposition to commit a crime. (Evid. Code, § 1101, subd. (a).) But the reason for excluding such evidence is not that it is irrelevant. Rather, the danger is that it has a tendency to bear too heavily on the jury's assessment of the defendant's guilt. "It may almost be said that it is because of the indubitable relevancy of specific bad acts showing the character of the accused that such evidence is excluded. It is objectionable not because it has no appreciable probative value but because it has too much." (1A Wigmore, Evidence (Tillers rev. 1983) § 58.2, p. 1212.) Indeed, the Supreme Court has recognized this principle, noting that such evidence is excluded not because it is irrelevant, but for extrinsic policy reasons, including prejudice to the defendant and jury confusion and distraction. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 21.)

But in certain kinds of cases, such as sex offenses and domestic violence offenses, the Legislature has relaxed the rules against character evidence and made prior similar misconduct admissible to prove propensity. (Evid. Code, §§ 1108, 1109; *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) The legislative history of Evidence Code

8

section 1109 shows specifically that evidence of prior domestic violence has been deemed probative in a case involving a new charge of domestic violence: "Section 1109 was intended to make admissible a prior incident 'similar in character to the charged domestic violence crime, and which was committed against the victim of the charged crime or another similarly situated person.' (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1876 (1995–1996 Reg. Sess.) June 25, 1996, p. 5 (Assem. Analysis of Sen. Bill No. 1876).) Thus, the statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation. (See *People v. Britt* (2002) 104 Cal.App.4th 500, 505–506 [§ 1108].) Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the 'typically repetitive nature' of domestic violence.[3] (Assem. Analysis of Sen. Bill 1876, *supra*, at pp. 6–7; see also [*People v.*] *Brown* [(2000)] 77 Cal.App.4th [1324,] 1333.) This pattern suggests a psychological dynamic not necessarily involved in other types of crimes. (See [*People v.*] *Hoover* [(2000)] 77 Cal.App.4th [1020,] 1027.)" (*Johnson*, *supra*, 185 Cal.App.4th at p. 532, second fn. omitted.)

Although the Supreme Court has not addressed the constitutionality of Evidence Code section 1109, the Courts of Appeal have uniformly held that, under the reasoning of *People v. Falsetta* (1999) 21 Cal.4th 903, it does not violate due process. (See, e.g., *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704; *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1120; *People v. Price* (2004) 120 Cal.App.4th 224, 239-241.)

The principal factor affecting the probative value of an uncharged act under Evidence Code section 1109 is its similarity to the charged offense. (*Johnson*, *supra*, 185 Cal.App.4th at p. 531.) Here, there was significant similarity. Carter and Dekker were

---

**3** " 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked.' (Assem. Analysis of Sen. Bill No. 1876, *supra*, at p. 3.)"

both intimate partners of appellant and both were mothers of his children. In both relationships he lashed out physically against the women during arguments. In Dekker's case there was evidence that he slapped her and drove off with their child, threatened to beat her head in with a hammer, and shoved her against a wall on a third occasion, giving her a black eye and a concussion. Dekker also told the police that appellant had slapped, choked, and threatened her throughout their relationship. She further told them there had been seven other incidents of domestic violence which she had not reported.[4]

In Carter's case, appellant beat her with a belt on the legs, pulled her by the hair, and slapped her, acts very similar to those involving Dekker. And he also threatened to kill both women if they went to the police and threatened the families of both women. These similarities are more than sufficient to make the prior incidents with Dekker admissible under Evidence Code section 1109. And he did not use a formal weapon with either woman, but used his hands or other available means (his belt) to inflict the injuries. The absence of formal weapons (such as a gun) means the evidence of his violence against Dekker was not so prejudicial as to outweigh its probative value.

In spite of the strong evidence of appellant's guilt in the present case (including photographs of Carter's injuries), both women testified that appellant did not physically abuse them, or in Dekker's case, that she was the aggressor. The testimony of family members, friends, neighbors and police helped to establish the facts of abuse against both women, and Dekker's reluctance to testify against appellant helped the jury understand why Carter also denied that appellant had abused her. The jury could have inferred that

---

**4** Appellant argues this evidence was "highly prejudicial." "The word 'prejudicial' is not synonymous with 'damaging.' [Citation.] Rather, evidence is unduly prejudicial under section 352 only if it ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues' " ' [citation], or if it invites the jury to prejudge ' " 'a person or cause on the basis of extraneous factors' " ' [Citation.] 'Painting a person faithfully is not, of itself, unfair.' [Citation.]" (*Johnson*, *supra*, 185 Cal.App.4th at p. 534.) The complained of evidence underscored the repetitive nature of domestic violence, as recognized by the Legislature (see fn. 3, *ante*), but it did not unfairly prejudice appellant within the meaning of Evidence Code sections 352 and 1109.

Carter refused to testify against appellant for the same reason Dekker did: appellant had threatened both of them with death if they turned him in. Knowing that Dekker was still afraid to testify against appellant some six years after the threats had been made could help the jury better understand the level of fear the women suffered, and why Carter might also be afraid to publicly accuse appellant of having committed violence against her. Thus, evidence relating to appellant's abuse of Dekker was highly relevant to both the domestic abuse charge and the dissuading count.

We also reject appellant's contention that the court failed to engage in the balancing process required under Evidence Code section 352. That weighing process was included in the decision to admit the evidence under Evidence Code section 1109, which incorporates the requirements of Evidence Code section 352. (See fn. 2, *ante*.) That the trial court did engage in a balancing process is demonstrated by the fact that it excluded evidence of Kimmons's claim that appellant also struck her, expressly relying on Evidence Code section 352. Moreover, a trial judge need not expressly weigh prejudice against probative value or even expressly state that he has done so. An appellate court can infer an implicit weighing on the basis of record indications. (See *People v. Padilla* (1995) 11 Cal.4th 891, 924; *People v. Triplett* (1993) 16 Cal.App.4th 624, 628–629.) The record in this case, which included counsel's arguments on the probative value versus the prejudicial effect of the evidence, clearly shows that the judge was aware of the balancing required under the governing statutes and engaged in such a process.

Appellant's reliance on *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*) is misplaced. In *Harris*, the court held a 23-year-old prior sex offense was too remote to be admissible under Evidence Code section 1108. (*Id.* at p. 739.) The defendant in that case was a male mental health nurse on trial for sexual battery of two incapacitated and mentally troubled women under his care, accused of fondling one patient and orally copulating another. (*Id.* at pp. 731–732.) Both incidents were nonviolent, and both victims remained "on speaking terms" with Harris afterwards. (*Id.* at p. 738.)

11

The prior conviction, by contrast, had been a brutal rape of Harris's neighbor, in which he had broken into her apartment late at night "while she was sleeping, beat her unconscious and used a sharp instrument to rip through the muscles from her vagina to her rectum, then stabbed her in the chest with an ice pick, leaving a portion of the pick inside her." (*Harris*, *supra*, 60 Cal.App.4th at p. 733.) "Defendant was found hiding nearby with 'blood on his hands, blood on his clothes, blood on his thighs, blood on his penis.' " (*Ibid*.)

The Court of Appeal reversed the defendant's conviction finding the evidence "was remote, inflammatory and nearly irrelevant and likely to confuse the jury and distract it from the consideration of the charged offenses." (*Harris*, *supra*, 60 Cal.App.4th at p. 741.) Moreover, though the evidence showed the prior offense was a brutal rape, Harris was convicted only of burglary with great bodily injury, which could have fueled speculation on the jury's part as to whether he was sufficiently punished for the prior offense, and could in turn make the jury more likely to convict on the current charges. (*Id.* at p. 738.) Also, Harris, unlike appellant here, had led a largely "unblemished" life for 23 years after the prior rape. (*Id.* at p. 739.)

*Harris* is distinguishable in many regards, including the remoteness of the prior conviction and the graphic, violent nature of the evidence relating to the prior offense. In contrast, here the prior events were not only more recent than in *Harris*, but their impact was less inflammatory, and the similarity of the prior acts to the charged offenses was greater.

Appellant argues that admission of the evidence of the prior domestic violence violated his federal constitutional right to due process and a fair trial, and therefore, the prejudice standard under *Chapman v. California* (1967) 386 U.S. 18, 24, applies. We disagree. The constitutionality of Evidence Code section 1109 has been upheld repeatedly. (*Johnson*, *supra*, 185 Cal.App.4th at p. 529.) There is nothing peculiar to its application in this case that convinces us appellant was deprived of a fundamentally fair trial or otherwise subjected to an unconstitutional evidentiary ruling. "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate

12

due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'  [Citation.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920, italics omitted.)  As discussed above, the propensity inferences based on the evidence of prior domestic violence were proper.  There was no constitutional violation.

### B.  Failure to Reduce Dissuading Conviction to a Misdemeanor

Prior to sentencing, defense counsel filed a request to reduce the dissuading count (§ 136.1, subd. (b)) to a misdemeanor under section 17, subdivision (b).  Counsel argued that the offense in this case was "minor in nature" because the dissuasion was "communicated via text message, and not in person," appellant "only has five prior felony convictions arising out of three criminal cases," and appellant was "cooperative and polite during his trial."  At the sentencing hearing, defense counsel suggested the court should sentence appellant to the mitigated term of two years on count one, reduce count three to a misdemeanor (which otherwise would constitute a strike (§ 1192.7, subd. (c)(37)), and run all sentences concurrently.  Defense counsel argued that the crime was not so serious that it should burden appellant with a strike conviction that would have "serious lifelong consequences."

The trial court denied the motion, reasoning as follows:  "All right.  Well, with respect to the Section 17 motion, that's fairly serious as a dissuading.  Moreover, the continued disregard for the protective order while in custody also suggests that a Section 17 would not be appropriate, as does the defendant's other criminal history.  That motion is denied."

A court has broad discretion under section 17, subdivision (b), in deciding whether to reduce a wobbler offense to a misdemeanor.  (*People v. Superior Court (Alvarez)* 1997) 14 Cal.4th 968, 974, 977 (*Alvarez*).)  We will not disturb the court's decision on appeal unless the party challenging the decision clearly shows the decision was irrational or arbitrary.  (*Ibid.*)  Absent such a showing, we presume the court acted to achieve legitimate sentencing objectives.  (*Id*. at pp. 977-978.)  Its discretionary determination

may not be set aside unless appellant carries the burden of showing the decision was irrational or arbitrary.  (*Ibid*.)

Dissuading a witness is a wobbler that may be sentenced either as a felony or a misdemeanor.  (§ 136.1, subd. (b).)  Section 17, subdivision (b), grants the trial court discretion to sentence a wobbler as a misdemeanor.  Factors to be considered in exercising its discretion include the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or traits of character as evidenced by the defendant's behavior and demeanor at trial.  (*Alvarez*, *supra*, 14 Cal.4th at p. 978.)

Appellant contends the trial court failed to consider the "individualized circumstances in his case," in particular that the threats were made by way of text messages.  He also argues that the court disregarded appellant's "successes on parole, his drug problem, and his attempts to address that problem."  But these factors are of little persuasive force when weighed against the factors militating against a reduction.

The dissuading count was not a minor incident, appellant's conduct while in custody was poor, and appellant's record was by no means pristine.  Appellant, who was on bail for a weapons charge at the time of the offense, threatened to kill Carter if she turned him in to the police, and threatened to shoot police officers if they came to the house.  Although a restraining order had issued during the pretrial period forbidding appellant to have contact with Carter, appellant in fact made 214 phone calls to Carter while in jail.  Yet, during his interview with the probation officer, appellant denied having any contact with Carter.  Appellant had nine felony convictions and five misdemeanor convictions as an adult.  The probation officer found appellant "has proved, by his prior and current history, his disinclination to take responsibility for his own behavior, his willingness to blame others for predicaments[,] and a lack of remorse for the victim . . . ."

The trial court took into consideration the relevant factors, including appellant's criminal past and the seriousness of the facts underlying the dissuading count.  Its refusal to reduce the dissuading count to a misdemeanor was neither irrational nor arbitrary.

## IV.

## DISPOSITION

The judgment is affirmed.

_____
RUVOLO, P. J.

We concur:


_____
REARDON, J.


_____
RIVERA, J.