[No. D043159. Fourth Dist., Div. One. Feb. 15, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
CAROLE ANN RUCKER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, Rule 976.1, this opinion is certified for publication with the exception of part IV.

COUNSEL

Randall Bookout, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Ronald A. Jakob and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**McCONNELL, P. J.**—Carole Ann Rucker was convicted by a jury of attempted murder involving the personal use of a firearm and great bodily injury (Pen. Code, §§ 664, 187, subd. (a), 12022.53, subd. (d), 12022.7, subd. (e)) and of exhibiting a firearm in the presence of a peace officer (Pen. Code, § 417, subd. (c)).

On appeal, Rucker contends the court erred in admitting a prior domestic violence incident under Evidence Code section 1109 because she was not in a "dating relationship" with the victim, the prior incident did not involve "domestic violence," and the evidence was unduly prejudicial and violated her right to due process; in ruling the prior domestic violence incident was admissible under Evidence Code section 1101, subdivision (b); in giving CALJIC No. 2.50.02 as it misled the jury on the use of prior uncharged offenses; and in failing to conduct further hearings into her claims of jury misconduct. We affirm.

## FACTS

Rucker, then about 50 years old, met the victim, Hubert Watson, through an Internet dating service. About two months later, in July 2001, they had their first date. They continued to date, including dining out at restaurants, eating dinner at Watson's condominium, going to Rucker's office Christmas party and attending a wedding of one of Watson's friends. They became sexually intimate within their first two or three dates. Watson purchased some lingerie and shoes for Rucker. In early December 2001, Watson had planned to take Rucker on a weekend trip to Hawaii but the trip was cancelled because he became ill.

Watson's job as a lobbyist frequently required him to travel away from San Diego; on average he would travel three to four weeks at a time and he was away from home about 75 percent of the time. Sometimes when he was out of town, he called Rucker or sent her e-mails. In the e-mails, he told her he missed her and was looking forward to seeing her when he returned to San Diego. Rucker thought Watson might be "the one" and, in late 2001 or early 2002, she wrote a list of goals that included marrying Watson in 2003.

By April 2002, Rucker became concerned that her relationship with Watson was waning because she had not heard from him. In early May, she placed a personal advertisement in a local newspaper to meet men. She met with two of the men who answered her advertisement. Rucker and Watson last dated in late April 2002. Watson's last e-mail to Rucker was on April 30. He wrote that he appreciated her very much and would see her soon. Rucker expressed her concerns and distress about the ending of her relationship with Watson to her friend and to Watson's close friend.

About 9:00 a.m. on Memorial Day (May 27), Rucker drove to Watson's condominium complex, parked her car, observed Watson in his patio and then left. She returned about 1:00 p.m. and watched his condominium throughout the afternoon. She saw him leave with another woman. Rucker was "stunned," she could not believe he wanted to spend time with someone else, and felt as if her life was falling apart. Eventually, she went to his condominium. When Watson answered the door and told her it was not a good time to visit, Rucker insisted upon coming in to meet the other woman. Watson testified Rucker was upset and told him, "You don't know what I'm capable of." He considered calling 911. However, he was able to convince her to go for a drive in his car where they talked for about three hours. Among other things, Rucker talked about her prior marriage and other failed relationships. He promised to call her the next day.

Early on May 29, Rucker called a close friend of Watson's. Rucker was very upset, saying she had seen Watson with another woman, did not see a future in the relationship and wanted to kill herself. Immediately after the phone call, the friend called Watson and told him, "This psycho Carole called me again. You really need to take care of this. She wants to kill herself over you." Watson said he would take care of it.

Watson called Rucker at work and briefly talked to her about how she was doing. Rucker asked to come by that evening to pick up some shoes that were at his condominium. He said that was fine.

Rucker arrived about 5:40 p.m. In her purse, she was carrying her gun. Normally, Rucker carried the gun under the front passenger seat of her car. She did not carry the gun in her purse when she ran errands, such as shopping, and had not previously carried the gun into Watson's home. She testified she carried the gun when she went to the gym and that she was planning to go the gym after seeing Watson.

When Rucker asked for wine, Watson poured her a glass. Rucker sipped the wine "[v]ery quickly" and when she was on her third glass she announced, "Now I have to stay for dinner. Now I can't leave and I have to stay for dinner because if I get stopped for drunk driving, you will be liable because you served me alcohol." Watson started to prepare dinner. While in the kitchen, Rucker put her arm around his neck, nuzzled him, and said, "Take me like a man," a statement which echoed comments she had made the previous day that he "could be rougher with her." They went to the bedroom and engaged in sex. He was rougher and said, "Can you take it [like] a woman?" at which point Rucker began to cry. She said, "You shouldn't have

said that." Watson was confused because she had not indicated he was hurting her, that sex was uncomfortable or that she wanted him to stop. He stopped. Rucker dressed, left the bedroom, went to her purse and pulled out her gun.

As Watson walked down the hallway, Rucker shot him. She followed him outside through the front door, where he collapsed to the ground. She shot Watson twice more while he was on the ground. She then put the gun in her mouth and pulled the trigger, but the gun did not discharge. She looked at the gun and again put the gun in her mouth. Again the gun did not discharge; she had fired all six bullets from the gun at Watson. At the time of trial, Watson still had three bullets in his body; two near his spine and one in his leg. He was "lucky to be alive."

Rucker drove home with the intent of getting additional bullets. The police followed her. She parked in her usual space and was surrounded by the police, who had their guns drawn. She got out of the car with her gun in her hand and pointed it at a police officer. The officer shot her several times.

*Prior Domestic Violence Incident*

For about two and a half years between 1996 and 1998, Rucker dated David Yu. She believed it was a good relationship with a future. In December 1998, Yu did not invite Rucker to his office Christmas party, as he had in the past, telling her he was going to be out of town. Rucker "crashed" the party, saw Yu was there with his friends and became "[d]istraught, sick to [her] stomach, [and] traumatized." Because she was drunk and asked for a ride, Yu drove Rucker to her home in her car. Yu spent the night and they engaged in sexual relations. The next morning Yu told her that he no longer wanted to see her. Rucker drove Yu home.

Later that day, Rucker called Yu and said she wanted to talk. Yu told her that he did not want to see her and hung up. About an hour later, Rucker showed up at his apartment. When he told her he had to go someplace and did not want to talk, she took out a handgun and said, "Please let me in. You know I know how to use this." Yu allowed her into his home, spoke with her and calmed her down. After awhile Rucker handed the gun to Yu. The gun was loaded. He returned the gun to her before she left.

Over the next two years Rucker harassed Yu by various means, including putting paint on his car, supergluing his car door locks, taking a windshield wiper from his car, and painting an obscenity on the sidewalk outside a friend's home where he had been attending a party. Yu talked with Rucker, asking her to stop. She said she did not mean to harm him, she was only trying to get his attention and would stop. She did not stop.

On July 3, 2000, Rucker chased Yu and a woman he was dating. The chase included high speeds on the freeway. Yu tried to evade Rucker but, because he thought the situation was dangerous, he pulled into a parking lot. Rucker followed him into the parking lot. Yu confronted Rucker and told her to leave him alone. She claimed she had not been following him, she was just driving to the store to make a purchase. A few days later in a telephone call, Rucker told Yu if she could not have him, no one could, a statement that prompted Yu to call the police. He obtained a restraining order against her, which stopped the harassment.

One of Rucker's former coworkers testified Rucker stated she was "very upset and hurt" by the way Yu had treated her and had wanted to kill him when she pulled out the gun.

### *Defense*

Rucker testified that on May 29 she intended to go to Watson's condominium only to pick up her shoes. She did not hate Watson and did not feel ill will toward him. She was confused when he offered her a glass of wine and was treating the situation as a social visit. She drank the wine to help her relax while he was on the phone for 20 to 25 minutes and did not realize how much she had drunk. She did ask him to "take [her] like a man," meaning he should be romantic and passionate. When they were in the bedroom, he raped her, refusing to stop when she told him he was hurting her and asked him to stop. He seemed to be getting pleasure out of hurting her and looked at her "with this evil smirking." The incident triggered memories of past rapes and she started crying. At this point, he jumped away, was angry, yelled at her about what did she mean when she said she wanted him to take her like a man, and stormed out of the bedroom.

Rucker did not remember getting the gun out of her purse. She remembered firing twice in his general direction inside the condominium and she remembered going outside but had no memory of shooting him again. She did remember twice putting the gun in her mouth and driving home to get more bullets. She denied trying to kill Watson or that she felt ill will toward him.

She was unsure if she remembered the police following her to her condominium. She remembered having the gun in her hand when she got out of her car but she did not remember pointing it at the police. She took her gun out of the car "[b]ecause it was [her] security blanket," she had "owned it a long time," and if she was going to die, "it was going to be with [her]."

Rucker's blood-alcohol level was .11 percent about an hour and a half after the shooting. A person with that alcohol level could experience a loss of critical judgment.

Rucker presented expert testimony indicating that she suffered from a borderline personality disorder, which could involve the "capacity to regress emotionally very quickly and very dramatically"; she suffered from depression; she was in a "disassociative [*sic*] state" triggered by the rape when she shot Watson, and she "seemed remarkably unangry" toward Watson.

## DISCUSSION

## I

### *Admission of Prior Domestic Violence Under Evidence Code Section 1109*

Rucker contends the court erred in admitting details of the prior Yu incident because she did not have a "dating relationship" with Watson, her relationship with Yu did not involve violence, the Yu incident was too dissimilar to the charged offense to warrant admission, and the court abused its discretion in not excluding the evidence pursuant to Evidence Code section 352.

 Under Evidence Code section 1109, evidence of a prior act of domestic violence is admissible to prove the defendant had a propensity to commit domestic violence when the defendant is charged with an offense involving domestic violence. The trial court has discretion to exclude the evidence if its probative value is outweighed by a danger of undue prejudice or confusing the jury, or would result in an undue consumption of time. (Evid. Code, §§ 1109, subd. (a)(1), 352.)

"Domestic violence," for the purposes of Evidence Code section 1109, is broadly defined as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." (Pen. Code, § 13700, subd. (b); Evid. Code, § 1109, subd. (d).) "Abuse" is defined as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subd. (a); see Evid. Code, § 1109, subd. (d).)

### *(A) Dating Relationship with Watson*

Rucker concedes she and Watson "obviously had a 'dating relationship' in some sense of the term," but contends it was "too casual to be a 'dating relationship' within the meaning of the relevant domestic violence statutes."

Rucker relies heavily on *Oriola v. Thaler* (2000) 84 Cal.App.4th 397 [100 Cal.Rptr.2d 822] (*Oriola*), where the court considered the meaning of the phrase "dating relationship" in the context of an application for a restraining order under the Domestic Violence Prevention Act (DVPA). (Fam. Code, § 6200 et seq.) Like Evidence Code section 1109, the DVPA applies to "dating or engagement" relationships. (Fam. Code, §§ 6301, subd. (a), 6211.) The *Oriola* court believed it was necessary to judicially create a definition of "dating relationship" because the Legislature had not defined the phrase and, according to the *Oriola* court, "the meaning of a 'dating relationship' is not clear enough to delineate the particular meaning the Legislature had in mind when it used these words." (*Oriola, supra,* 84 Cal.App.4th at p. 407, fn. omitted.) The court first reviewed the history of dating. The court then looked at statutes in other states, which had definitions of a "dating relationship." These statutes defined a dating relationship in terms of "frequent, intimate associations primarily characterized by the expectation of affectional involvement" (Mich. Comp. Laws Ann. § 600.2950(30)(a)); "frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement" (Nev. Rev. Stat. § 33.018(2)); and "a social relationship of a romantic nature," a determination that could be based on such factors as: "(a) [t]he length of time the relationship has existed; (b) the nature of the relationship; and (c) the frequency of interaction between the parties" (Wash. Rev. Code § 26.50.010(3)). Several states had definitions of what did not constitute a dating relationship. The statutes specified a dating relationship did not "include a casual relationship or an ordinary fraternization between 2 individuals in a business or social context." (Mich. Comp. Laws Ann. § 600.2950(30)(a); see 725 Ill. Comp. Stat. § 5/112A-3(3) [essentially identical language]; see Nev. Rev. Stat. § 33.018(2) [essentially identical language].)

After reviewing the history of dating and statutory definitions in other states, the *Oriola* court created the following definition: "[F]or purposes of the [DVPA], a 'dating relationship' refers to serious courtship. It is a social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual." (*Oriola, supra,* 84 Cal.App.4th. at p. 412.)

The court concluded a "dating relationship" had not been established in the case before it since the parties went on only four social outings, were alone only on one outing, the appellant had told the respondent after the first date that she was not interested in a romantic relationship, the relationship was

relatively brief, and the appellant in a police report had made it clear she was not the respondent's "girlfriend" but was an "acquaintance." (*Oriola, supra,* 84 Cal.App.4th. at p. 412.)[1]

■ After *Oriola* was decided, the Legislature enacted a definition of "dating relationship" in the DVPA: " 'Dating relationship' means frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations." (Fam. Code, § 6210.) The same definition of "dating relationship" appears in Penal Code section 243, subdivision (f)(10) defining the offense of battery. Thus, Rucker's reliance on *Oriola's* definition of a dating relationship is misplaced, since it predates the Legislative definition.

The definition of a dating relationship adopted by the Legislature does not require "serious courtship," an "increasingly exclusive interest," "shared expectation of growth," or that the relationship endures for a length of time. (*Oriola, supra,* 84 Cal.App.4th at p. 412.) The statutory definition requires "frequent, intimate associations," a definition that does not preclude a relatively new dating relationship. The Legislature was entitled to conclude the domestic violence statutes should apply to a range of dating relationships. The Legislature could reasonably conclude dating relationships, even when new, have unique emotional and privacy aspects that do not exist in other social or business relationships and those aspects may lead to domestic violence early in a relationship. An individual who engages in domestic violence may have a pattern of abuse that carries over from short-term relationship to short-term relationship. As the legislative history of Evidence Code section 1109 indicates, the Legislature recognized domestic violence is an ongoing problem. (See *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027–1028 [92 Cal.Rptr.2d 208], quoting Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1876 (1995–1996 Reg. Sess.) June 25, 1996, pp. 3–4 [" 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked.' "].)

---

[1] The court in *Andrews v. Rutherford* (2003) 363 N.J.Super. 252, 259 [832 A.2d 379, 383] criticized *Oriola*'s adoption of "a comprehensive definition of what constitutes a 'dating relationship,' " noting that "such a determination is necessarily fact sensitive and thus warrants a 'factor approach' rather than a 'definitional approach.' "

Moreover, even if the statutory definition did not exist and did not conflict with the *Oriola* court's definition, we would not be bound by the *Oriola* definition; the *Oriola* court's definition is mere dictum in light of the facts of the case. The relationship at issue in *Oriola* was clearly, by any reasonable person's definition, not a dating relationship. The parties had had only four social outings, only one of them alone; at the outset of the relationship the appellant had made it clear she did not want a romantic relationship with the respondent and had characterized herself as an acquaintance, not a girlfriend. In other words, the parties were, at most "just friends," and not in a dating relationship.

While the *Oriola* court's definition of a "dating relationship" does not accord with the Legislature's definition to the extent the *Oriola* court required "serious courtship," and "increasingly exclusive interest," and a "shared expectation of growth," the *Oriola* court's conclusion that a "dating relationship" does not include "a casual relationship or an ordinary fraternization between [two] individuals in a business or social context"[2] does accord with the statutory definition.

Here, as we noted above, Rucker concedes she had a dating relationship with Watson; she only argued that it was too "casual" to meet the definition outlined in *Oriola*. As we have explained, we find the *Oriola* definition to be unduly narrow. There is substantial evidence in the record to support a finding her relationship with Watson was a "dating relationship" within the meaning of the statutory definition and not merely a casual business or social relationship. Rucker and Watson had frequent, intimate associations when Watson was in town over a period of approximately nine months and he communicated his affection to her when he was out of town. The relationship was characterized by the expectation of affection and sexual involvement. Watson testified it was a "dating relationship." Rucker believed it was a serious relationship, possibly leading to marriage.

In sum, there was substantial evidence in the record to support the predicate finding she and Watson had a "dating relationship" within the meaning of Evidence Code section 1109.

### (B) Prior Incident Involved Domestic Violence

Rucker contends evidence relating to Yu should not have been admitted because no "domestic violence" occurred. Rucker points out that Yu testified

---

[2] Michigan Compiled Laws Annotated section 600.2950(30)(a); 725 Illinois Compiled Statutes section 5/112A-3(3) (essentially identical language); Nevada Revised Statutes section 33.018(2) (essentially identical language).

he was not "as scared initially when it actually happened." She also points out that when Yu asked for the gun, she gave it to him and he handed it back to her when she left.

Domestic violence is defined as including "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subd. (a); see Evid. Code, § 1109, subd. (d).)

█ Essentially, Rucker is challenging the sufficiency of the evidence to support a finding she engaged in a violent act. There is no question that her act in pointing the gun at Yu when he refused to talk to her constituted a violent act. Such conduct could have been punished as an assault with a firearm. (See Pen. Code, § 245, subd. (a)(2); *People v. Colantuono* (1994) 7 Cal.4th 206, 219 [26 Cal.Rptr.2d 908, 865 P.2d 704] ["As this court explained more than a century ago, 'Holding up a fist in a menacing manner, drawing a sword, or bayonet, presenting a gun at a person who is within its range, have been held to constitute an assault.' "].) An assault with a deadly weapon is a "violent felony." (Pen. Code, § 667.5, subd. (c)(8).) Such an act is clearly encompassed within the domestic violence definition of "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subd. (a); see Evid. Code, § 1109, subd. (d).)

To the extent Rucker argues no domestic violence occurred because Yu was not scared and she turned the gun over to him, we are unpersuaded. Yu testified that he was scared when she pointed the gun, became more frightened after she left and, in hindsight, believed he should have called the police at the outset. Additionally, there was evidence indicating that when she drew the gun, she had wanted to kill Yu.[3] Finally, we note that the fact she eventually handed the gun to Yu and he kept it in his possession until she left says more about Yu's abilities to pacify her than about the violence of Rucker's act of pointing her gun at him and reminding him that she knew how to use it.

---

[3] Rucker's coworker testified Rucker had told her about the Yu incident and stated when she had pulled the gun on Yu she had wanted to kill him. Rucker seeks to minimize this evidence, suggesting the coworker's testimony was "tentative" and unclear. Rucker suggests we should interpret the testimony as indicating she was merely "mad enough to kill him." This interpretation ignores the rule of appellate review requiring us to view the evidence in the light most favorable to the judgment.

Moreover, Rucker's confrontation of Yu with the gun was only the beginning of a two-year campaign of harassment and stalking that culminated in a dangerous high-speed chase and a threat to Yu that if Rucker could not have him, no one could.

We conclude there was substantial evidence to support the predicate finding Rucker had engaged in domestic violence against Yu.

### (C) Prior Incident Was Properly Admitted over an Evidence Code Section 352 Objection

Rucker contends the prior Yu incident should have been excluded pursuant to Evidence Code section 352 because there were "glaring dissimilarities" between the two incidents, and therefore any probative value of the Yu incident was outweighed by a danger of undue prejudice.

Under Evidence Code section 352, the court has discretion to exclude relevant evidence " 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Robinson v. Grossman* (1997) 57 Cal.App.4th 634, 647 [67 Cal.Rptr.2d 380].) " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320 [75 Cal.Rptr.2d 412, 956 P.2d 374].) Relevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s). (See *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1139 [83 Cal.Rptr.2d 320]; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315 [97 Cal.Rptr.2d 727].)

Rucker asserts the Yu incident was not relevant to show she premeditated and deliberated the attempted murder of Watson. She states "[t]he two uses of the same firearm could not have been more disparate," reasoning: "In the Yu case, [she] used the gun as a means of talking to Yu, who otherwise refused to talk to her the day after he had spent the night with her, and her meekly handing him the gun when he asked for it does not illustrate she 'was prepared to engage in premeditated acts of violence.' Watson, on the other

hand, was apparently unaware the gun was even in his house until the moment he was shot." We disagree and find there are remarkable similarities between the prior incident and charged offense.

In both situations Rucker had been dating the victim for a substantial period of time, she reacted to the ending of the relationship by confronting the victim with a gun at the victim's residence, and there was evidence showing Rucker pointed the gun at the victim with an intent to harm or kill the victim. Also in both situations, she engaged in stalking the victim—with Yu, the stalking occurred over a two-year period; with Watson, the stalking occurred just prior to the shooting when she staked out his residence and covertly watched him from her car.

The fact Watson was unaware of the gun prior to the shooting does not render the two situations unduly disparate. The relevance of the Yu incident was to show Rucker reacted violently to a relationship breaking up and to undermine her claim she became violent because Watson raped her. The fact Rucker did not shoot Yu, as she did Watson, does not necessarily lead to a conclusion she had no intent to harm Yu; instead a reasonable inference may be drawn that she did not shoot Yu only because he was sufficiently adept at pacifying her.

Introduction of the evidence was not unduly prejudicial. The Yu incident was relatively recent. Rucker confronted Yu with the gun in December 1998 and continued to harass and threaten him until July 2000. She began dating Watson about a year later, in July 2001. There is no evidence suggesting she had any significant intervening relationship. Proof of the Yu incident was straightforward; the evidence was essentially undisputed. The Yu incident was not inflammatory compared to the charged offense. Unlike the charged offense, Rucker never fired her gun at Yu or otherwise made an actual attempt to kill him. There was no reasonable probability the jury might confuse the two incidents. The fact the jury was unable to reach a unanimous verdict on the allegation that she had acted with premeditation and deliberation tends to show the jury did not convict her based on having been inflamed by the prior incident.

*(D)* *Admission of the Evidence Did Not Violate Due*
*Process*

Rucker contends the use of prior uncharged acts as propensity evidence violated her right to due process. She acknowledges, however, the Supreme Court has rejected this argument (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 [89 Cal.Rptr.2d 847, 986 P.2d 182]) and we are bound by its decision (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]).

## II

### *Admission Under Evidence Code Section 1101, Subdivision (b)*

■ Evidence Code section 1101, subdivision (b) permits evidence of a prior uncharged offense to prove a disputed issue such as intent. Rucker contends the Yu incident was not admissible to prove intent because it was too dissimilar to the charged offense. We have already addressed and rejected this argument. (See pt. I(C), *ante*.)

## III

### *CALJIC No. 2.50.02*

Rucker contends CALJIC No. 2.50.02, which instructs the jury on the use of an uncharged offense,[4] creates an unreasonable inference that violates the federal due process clause, that is, that a prior incident of domestic violence may support an inference that a defendant had a disposition to commit another offense involving domestic violence. Rucker contends the instruction created "an illogical permissive inference" in this case because the two incidents were greatly disparate. We rejected her argument the two incidents were dissimilar in part I(C), *ante*.

## IV*

### *Jury Misconduct*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[4] CALJIC No. 2.50.02 as given in this case told the jury, inter alia: "If you find by a preponderance of the evidence, that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit another offense involving domestic violence."

*See footnote, *ante*, page 1107.

## DISPOSITION

The judgment is affirmed.

Huffman, J., and Haller, J., concurred.

A petition for a rehearing was denied March 3, 2005, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 18, 2005.