Filed 4/1/15  P. v. Bush CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B254817 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA092372) |
| v. | |
| DONALD LEE BUSH, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Tomson T. Ong, Judge.  Affirmed.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Donald Lee Bush, Jr. (defendant) appeals from his murder conviction. He contends that the trial court erred in admitting evidence of an uncharged crime or past misconduct under Evidence Code section 1101 and propensity evidence under Evidence Code section 1109.[1] He contends that the admission of such evidence resulted in a denial of due process and that the two statutes violate the constitutional guarantees of due process and equal protection. Finally, defendant contends that the trial court erred in refusing to instruct the jury with regard to voluntary manslaughter as a lesser included offense of murder. Finding no merit to any of defendant's contentions, we affirm the judgment.

## BACKGROUND

**Procedural history**

Defendant was charged with the murder of Dana Milo (Milo), in violation of Penal Code section 187, subdivision (a). The information also alleged that defendant personally used a deadly and dangerous weapon in the commission of the offense, within the meaning of Penal Code section 12022, subdivision (b)(1). A jury found defendant guilty of murder as charged, found the murder to be in the first degree, and found true the deadly weapon allegation. On February 24, 2014, the trial court sentenced defendant to 26 years to life in prison. The court imposed mandatory fines and fees, and calculated presentence custody credit as 642 actual days, with no conduct credit. Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

In May 2012, defendant lived with Milo in room 105 of an apartment building in San Pedro. At 1:31 a.m. on May 24, 2012, police were called to the room and found Milo lying dead on the bed, cross-legged with a plastic bag wrapped around her head. Blood was on the pillow cases and elsewhere in the room. Detective Isidro Rodriguez testified that it appeared Milo had been sitting up watching television when she was

---

[1] All further statutory references are to the Evidence Code, unless otherwise indicated.

struck on the head. A search of the room turned up a hammer with blood on it, but no other metal or hard objects that could have caused similar injuries.

Sharon Anderson testified that she lived in the room next door, and on May 23, 2012, about 10:00 or 10:30 p.m., she looked through the slightly open door to room 105 as she was walking to the communal bathroom at the end of the hall. She saw Milo inside with defendant and exchanged glances with Milo who was sitting on the bed cross-legged. Defendant was bending over, apparently picking up something. The door was closed when Anderson returned from the bathroom about five minutes later, although residents usually left doors slightly open due to the hot weather.

Another neighbor, Carmela Rodriguez, testified that she was asleep that evening, awakened about 9:30 or 10:00 p.m. by a telephone call, and then heard what sounded like three blows that made a squishy sound as though someone was hitting a watermelon. After each blow, she heard a sigh. The third sigh sounded like the life leaving someone. Curious, Rodriguez stepped into the hallway and saw defendant at his door. Rodriguez saw no signs of an injury on defendant. After defendant and Rodriguez made eye contact, defendant closed his door and Rodriguez proceeded down the hall to the bathroom. When she returned, defendant's door was closed.

Resident building manager Scott Fender testified that about 1:00 or 1:15 a.m. that night when he left his room to move his motorcycle to the back of the building, he saw defendant wearing a baseball cap, poking his head out of the door of his room. After the two men greeted each other, Fender went outside. A few minutes later, Fender saw defendant standing nearby looking nervous. Fender accompanied defendant back to his room where he saw Milo sitting cross-legged on the bed, looking gray. Fender shut the door and asked his wife to call 911. Defendant was no longer wearing the baseball cap and Fender noticed a large welt and some blood on defendant's forehead.

Defendant was taken to the hospital. Emergency room nurse Gabriel Gomez testified that he treated defendant for two lumps and a superficial cut on his forehead. Defendant was given a CT scan which ruled out bleeding in the brain and a skull fracture. Over the course of his career, Gomez had seen about 500 head traumas caused by hard

3

objects such as clubs, baseball bats, rocks, steel-toed boots, bottles, and hammers. Many of them were self-inflicted, and most of those were located on the forehead and did not involve serious injury.

Treating emergency physician David Munoz testified that defendant appeared to have consumed alcohol but was not combative and had normal strength in his extremities. Dr. Munoz observed two minor lumps and v-shaped lacerations on defendant's forehead near his scalp which were consistent with self-inflicted wounds. He saw no defensive wounds. Dr. Munoz sealed defendant's cuts with a medical adhesive to stop any bleeding, and opined that bleeding would reoccur only if someone tampered with the sealed wound.

After defendant was released from the hospital and transported to the police station, Detective Rodriguez and his partner stripped him, examined his entire body, and documented his injuries. A few hours later, Detective Rodriguez noticed a change in defendant's head wound. The detective thought defendant had done something to cause it to bleed.

Medical examiner Stephen Scholtz testified that he performed the autopsy on Milo, and determined she died from injuries caused by blunt force trauma to her head and neck, consistent with two blows by a hammer inflicted at least 20 minutes apart. Dr. Scholtz explained that the blow to the neck damaged the vertebral artery and caused blood to accumulate at the base of the skull, a process that would normally take from 20 minutes to four hours. In Dr. Scholtz's opinion, this blow was delivered first, as Milo would have been alive at least 20 minutes until the blood found its way to the base of the brain. Milo also had a bone-deep laceration on her scalp and a depressed fracture of the skull, which Dr. Scholtz considered the second blow, as it would have instantly or very rapidly resulted in death. Milo's blood alcohol content was about .20 percent, and she had methamphetamine in her system in a therapeutic (medicinal) range.

The prosecution's expert witness, emergency physician Marie Russell, testified that she had reviewed defendant's medical records and photographs taken after his arrest. She found old torso injuries but no evidence of defensive wounds. Defendant had a fresh

4

bruise, some swelling, and some blood on his forehead near the hairline, which Dr. Russell found to be consistent with a blow from the flat, non-clawed part of the hammer. Dr. Russell could not definitively say whether the injuries were self-inflicted or assaultive, but she found that several facts suggested that they were self-inflicted. Dr. Russell noted that none of defendant's injuries was severe, there were several wounds in the same small area, they were in the forehead, and there were no defensive wounds. Assaultive hammer wounds were generally very deep, requiring multiple layers of suturing to close, and often associated with skull fractures.

Dr. Russell also reviewed the autopsy report, and agreed with the medical examiner that the blow to the neck came first. She also opined that the neck blow immediately incapacitated Milo so that she could not move even if she continued to live for awhile.

Diane H. (Diane) testified that in 2007, she stayed with defendant off and on for some time at the Palos Verdes Inn, room 12. In the early morning hours of August 7, 2007, defendant struck her with a 40-ounce beer bottle as she sat on the bed. They had been watching a movie and defendant wanted to start another movie, but because had Diane seen it several times before, she said she was going to go to bed as soon as she finished her cigarette. Without saying anything, defendant struck her on the left side of her head with the bottle. Several teeth were knocked out and her lip was cut through and through, requiring stitches inside and outside her mouth. Diane denied that she had been drinking or holding a bottle of beer at that time. She also denied that she lived with defendant or had a key to his room. She claimed they had sex just twice, and the last time was a week before the incident.

Los Angeles Police Officer Irene Castro testified that on August 7, 2007, she was called to the Palos Verdes Inn, where she spoke to Diane and defendant. After Diane reported that she had been struck in the face with a 40-ounce King Cobra glass bottle, Officer Castro found such a bottle in room 12. Diane identified it as the weapon and identified defendant as her assailant. Defendant told Officer Castro that Diane had hit him in the head with a 12-ounce beer bottle, which made him angry, so he hit her back,

5

also with a 12-ounce beer bottle.  Officer Castro searched room 12, but was unable to find a 12-ounce bottle or any bottle other than the 40-ounce King Cobra beer bottle.  She also examined defendant's body for any visible injuries and defensive wounds, but found none.  Diane admitted to Officer Castro that she had been drinking.  Her breath smelled of alcohol and she appeared to be intoxicated.

Officer Juan Terrazas testified that he was called to the Palos Verdes Inn on April 2, 2011, and found a distraught Milo in room 12.  Milo had visible injuries on her face, she was crying, and appeared to have been in an altercation.  She also appeared to have been drinking.  Officer Terrazas interviewed Milo, took photographs, and filed a cohabitant abuse report.  Defendant was registered in room 12 but was not there and Officer Terrazas was unable to find him.

## DISCUSSION

### I.  Uncharged crimes evidence

#### A.  *Standard and scope of review*

Defendant contends that the trial court erred in admitting evidence of the August 2007 incident involving Diane, and that the error resulted in a denial of his constitutional rights to due process and a fair trial.  At the hearing on the pretrial motion to admit the evidence pursuant to section 1109, subdivision (a)(1), the prosecution argued that the evidence was also admissible under section 1101, subdivision (b).  The trial court found the evidence admissible under both sections.

As relevant here, section 1101, subdivision (a), prohibits evidence of specific instances of a defendant's conduct when offered to prove his conduct on a specified occasion, except as provided in section 1109.  Subdivision (b) of section 1101 provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act."  We review the trial court's

6

rulings under section 1101 for an abuse of discretion.[2]  (*People v. Fuiava* (2012) 53 Cal.4th 622, 667-668.)

Section 1109 provides an exception to section 1101 in cases where a criminal defendant is accused of an offense involving domestic violence.  In such cases, "evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."  (§ 1109, subd. (a)(1).)  "The court enjoys broad discretion in making this determination, and the court's exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citations.]"  (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233, fn. omitted.)

### B.  Section 1109

Defendant contends that the incident involving Diane was not "domestic violence" and was thus not admissible under section 1109.

"'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code [and] as set forth in Section 6211 of the Family Code . . . ."  (§ 1109, subd. (d)(3).)  Both sections define domestic violence as abuse committed against a person with a current or former specified relationship with the defendant, including a cohabitant or a person with whom the defendant has had a dating relationship.  "Dating relationship" is defined in Family Code section 6210 as "frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations."

---

**2**  Defendant acknowledges that the admission of other crimes evidence is reviewed for an abuse of discretion, while at the same time, he suggests that a de novo review is required because he has made a constitutional argument.  As defendant did not make a constitutional argument below, he may argue that the error resulted in the additional consequence of violating constitutional rights, but only if he first establishes error under state law.  (See *People v. Thornton* (2007) 41 Cal.4th 391, 443-444; *People v. Partida* (2005) 37 Cal.4th 428, 435-439.)

First, defendant points out that Diane was not a cohabitant, as she denied living with defendant or even having a key to defendant's room. Defendant then contends that having sex twice did not amount to a dating relationship. Defendant relies on the very restrictive definition of "dating relationship" formulated in *Oriola v. Thaler* (2000) 84 Cal.App.4th 397 (*Oriola*), and applied to an application for a restraining order under the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200 et seq.). The *Oriola* court equated a dating relationship with a "serious courtship" and defined it as "a social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual." (*Oriola, supra*, at p. 412.)

The *Oriola* definition is obsolete as it was formulated before the California Legislature added Family Code section 6210 to clarify the meaning of "dating relationship." (See *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1114-1116 (*Rucker*).) The legislative definition does not require a courtship, exclusivity, or an expectation of a lasting relationship, and the phase, "frequent, intimate associations," in the statutory definition does not preclude a relatively new dating relationship. (*Id*. at p. 1116, quoting Fam. Code, § 6210.)[3]

Defendant contends that it was not clear whether Diane's relationship with defendant included sex before or after the beer bottle incident, despite Diane's testimony that they had sex the week before the incident. In any event, the statute does not require frequent *sexual* relations, but merely "frequent, *intimate* associations" which are primarily characterized by the "*expectation* of affection *or* sexual involvement." (Fam. Code, § 6210, italics added.) A dating relationship is one with "unique emotional and

---

[3]     We also agree with the *Rucker* court that the *Oriola* definition was mere dictum, as the parties were not in a dating relationship by any reasonable person's definition but at most, were "'just friends.'" (*Rucker, supra*, 126 Cal.App.4th at p. 1117.)

privacy aspects that do not exist in other social or business relationships" and which distinguish it from mere casual social or business relationships. (*Rucker, supra*, 126 Cal.App.4th at pp. 1116-1117; see also *People v. Upsher* (2007) 155 Cal.App.4th 1311, 1322-1323.) Here, Diane stayed with defendant off and on, their relationship was sexual in nature, and there was no evidence of financial considerations. We agree with the trial court and respondent that the statutory definition of dating relationship was satisfied. (See Fam. Code, § 6210.)

### C. *Section 1101, subdivision (b)*

In addition to finding the evidence admissible under section 1109, subdivision (a)(1), the trial court found the evidence admissible to show intent, absence of mistake, and modus operandi, three of the exceptions enumerated in subdivision (b) of section 1101. Defendant contends that the incident involving Diane was too dissimilar to the current offense to prove intent or a pattern of behavior. He argues that the only similarity was the use of a weapon. In addition, defendant suggests that the prior incident would prove no more than an intent to commit an assault with a deadly weapon, not an intent to kill.

Defendant understates the similarities of the two incidents. "To be admissible, there must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented. The least degree of similarity is needed when, as here, the evidence is offered to prove intent. [Citation.]" (*People v. Jones* (2011) 51 Cal.4th 346, 371.) Further, the intent to be proven may be normal criminal intent as opposed to an innocent mental state. (*Ibid*.) The fact that an earlier victim of a similar assault survived to testify in a later murder trial does not render the evidence less probative of defendant's intent. (See *People v. Kelly* (2007) 42 Cal.4th 763, 783, 785.)

We agree with the trial court the two incidents were sufficiently similar to raise an inference of criminal intent. Further, the two incidents also met the requirement of a greater degree of similarity to show a pattern of behavior suggestive of a common plan or modus operandi. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).) Indeed, we

9

agree with respondent that the similarities were overwhelming. In both incidents, defendant and a woman companion were alone in his room watching television, when he struck the woman in the head with a heavy, blunt object. Also, defendant claimed Diane had struck him first but he had no defensive wounds; and in the current incident, defendant presented with apparently self-inflicted wounds, suggesting an intent to create support for a similar defense, without any defensive wounds.

We observe that defendant does not contend that the court erred in ruling that the evidence was admissible to show absence of mistake. Defense counsel told the court he intended to argue that Milo had playfully struck defendant twice with the hammer and that defendant reacted without malice by reflexively taking the hammer from her and hitting her back. The prosecutor then pointed out that defendant made a similar claim after striking Diane. In ruling the evidence admissible, the trial court noted that any argument that the hammer incident was playful would probably result in a defense request for an instruction on accident or misfortune.

Further, the trial court was not limited by the examples enumerated in section 1101, subdivision (b). (*People v. Catlin* (2001) 26 Cal.4th 81, 146.) Other crimes evidence "may properly be admitted whenever it tends logically, naturally, and by reasonable inference to establish any fact material for the People *or to overcome any material matter sought to be proved by the defense*. [Citations.]" (*People v. Montalvo* (1971) 4 Cal.3d 328, 331-332, italics added; see also *People v. Spector* (2011) 194 Cal.App.4th 1335, 1373.) Here, by anticipating a defense request for an instruction, the trial court impliedly ruled in accordance with this principle in addition to finding the evidence relevant to negating accident or mistake.

As we find sufficient similarity in the two incidents to raise a reasonable inference of intent, and as defendant has not challenged the court's finding regarding absence of mistake, we conclude that the trial court did not abuse its discretion in determining that the prior incident involving Diane was admissible under section 1101, subdivision (b).

10

*D. Section 352*

### 1. Balancing required

Before admitting evidence of uncharged crimes under section 1101 or 1109, a trial court must take the additional step under section 352 of weighing the probative value of the evidence against the probability that admission of the evidence "would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury. [Citation.] On appeal, a trial court's resolution of these issues is reviewed for abuse of discretion. [Citation.] A court abuses its discretion when its ruling 'falls outside the bounds of reason.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 371.) Due to the "substantial prejudice inherent" in uncharged crimes, the probative value of such evidence must be substantial. (*People v. Kelly, supra*, 42 Cal.4th at p. 783.)

### 2. Balancing process was implied

First, defendant contends that the trial court failed to engage in the required weighing process, and that the court failed to make a finding on the question, but merely ruled that the evidence was admissible. The record demonstrates otherwise.

While the trial court "could have been more explicit in explaining its reasoning, 'we review the ruling, not the reasoning.'" (*People v. Carter* (2005) 36 Cal.4th 1114, 1152.) Although it is the "better practice" for the trial court to set forth on the record its balancing of the probative value of the evidence against its potential prejudicial effect, a failure to do so is not erroneous when the court heard lengthy argument on the issue as it did in this case. (*Id.* at pp. 1151-1152.)

At the hearing on the prosecution's motion, the trial court heard defense counsel's argument that the "incident may be so close in terms of the use of a bottle to this woman's face and the evidence here that it could confuse the jurors and be prejudicial against [defendant]." The court replied that the similarity of the two incidents made the evidence highly relevant and that all relevant evidence was prejudicial. The court indicated it would evaluate the question, and then heard arguments regarding probable prejudice and the probative value of the incident involving Diane.

11

Although the trial court's ruling was not an express statement that the probative value of the incident outweighed the potential for prejudice, such a finding was clearly implied. The court expressly found that Diane and defendant had a dating relationship, and thus the bottle incident involved domestic violence. Then the court discussed defendant's indicated defense based on asserted playfulness to negate malice and ruled the evidence admissible. Finally, the trial court heard further argument on the issue after jury selection. It is thus reasonably clear that the trial court weighed potential prejudice against probative value.

### 3. No undue prejudice

Defendant also contends that the evidence was more prejudicial than probative. The various factors to be considered when weighing the probative value against the prejudicial effect of uncharged crimes evidence include: the tendency of the uncharged offense to demonstrate the fact in issue; the independence of the source of the uncharged crime; whether the facts of the uncharged crime are more inflammatory than the facts of the charged offense; the remoteness in time to the charged offense; whether there is other evidence to substantiate the fact in issue; and whether the uncharged crime resulted in conviction. (*Ewoldt, supra*, 7 Cal.4th at pp. 404-406.)

Defendant argues that the evidence was minimally probative of intent or common plan because it was only vaguely similar. We glean four reasons from defendant's argument that the potential prejudicial effect outweighed probative value: it suggested that he had a bad character and a disposition to abuse women; it suggested deliberate and premeditated murder rather than an accident; it was unduly inflammatory; and it served to bolster the prosecution's case, which was weak due to the absence of eyewitness or other direct evidence of the events leading up to the fatal blow.

Initially we note that the purpose of admitting evidence under section 1109 is to prove defendant's propensity to abuse women such as Diane and Milo. (See *Rucker, supra*, 126 Cal.App.4th at p. 1114.) And we do not agree with defendant's characterization of the prosecution case as weak simply because it was based upon circumstantial evidence. As we have already determined that the two incidents were

12

remarkably similar, the prior incident had great probative value in proving defendant's propensity. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 285.) It follows that the prior incident had a substantial tendency to prove that defendant harbored a criminal intent in both cases, and that neither incident was an accident or the result of a mistake. In addition, the source of the other crimes evidence was independent of the charged offense, as the assault on Diane was unrelated to the current offense, and the testimony of the two police officers there involved served to substantiate Diane's testimony. Finally, the assault on Diane was not remote in time, in that it occurred less than five years before the current offense. Also it was not more inflammatory than the current offense as it was a single blow, not two, and did not result in death.

Thus, all but one of the *Ewoldt* factors favor the trial court's determination that the probative value of the evidence outweighed the potential for undue prejudice: that the uncharged crime did not result in conviction. Such a circumstance can increase the danger that a jury might be inclined to punish defendant for the uncharged offense, regardless if it considered him guilty of the charged offenses. (*Ewoldt, supra*, 7 Cal.4th at p. 405.) However, the fact that the assault on Diane was less inflammatory reduced its potential for prejudice in the murder case. (See *ibid*.) We conclude that the trial court properly exercised its discretion under section 352, in a manner that was neither arbitrary, capricious, nor patently absurd.

Moreover no miscarriage of justice is shown. Defendant must demonstrate not only that the ruling was erroneous, but also that the error resulted in a miscarriage of justice, as defined in *People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*). (*People v. Paniagua* (2012) 209 Cal.App.4th 499, 524.) Thus defendant must show that an examination of the entire record demonstrates a reasonable probability of a more favorable result in the absence of the claimed error. (*Watson, supra*, at pp. 836-837.)

Contrary to this required scope of review, defendant focuses on the challenged evidence and disregards all unchallenged evidence. He then reargues in essence, that evidence of the incident involving Diane was more prejudicial than probative, and that the court's limiting instructions were too general to cure the prejudice. Defendant also

13

contends that the prejudicial effect was exacerbated by the prosecutor's inflammatory argument that defendant was "a wife beater. He's an abuser of women. He hits their heads. He uses hard objects, at least the one time. Then go, now you've got the beyond a reasonable doubt standard to prove that he murdered [Milo] and he murdered her with premeditation, deliberate and willful." Defendant does not argue that without the alleged error -- that is, if the trial court had excluded the prior crime evidence -- there would have been a reasonable probability of a more favorable result.

We have reviewed the entire record, including all the unchallenged evidence, and conclude first that the evidence supporting the jury's finding that defendant killed Milo was overwhelming. Between 9:30 and 10:30 p.m. on the night Milo was killed, defendant and Milo were together in defendant's room with the door open. When Anderson saw Milo about that time, Milo was alive and sitting cross-legged on the bed in defendant's room, as the two women made eye contact. Defendant was picking up something from the floor. Then, after the door was closed, Rodriguez heard blows, a squishy sound, and sighs, including a long final sigh that sounded like someone dying. Defendant was still in his room at that time, as Rodriguez thereafter saw him peak out from his door. When defendant led Fender into his room, Milo was either dead or dying, sitting in the same cross-legged position on the bed. The police soon found Milo dead on the bed, with her legs in the same position.

Second, the evidence of defendant's premeditated intent to kill Milo was also overwhelming. Defendant's first blow struck Milo near her clavicle and immediately incapacitated her. Then she remained alive but immobile for at least 20 minutes before defendant delivered the final fatal blow. The inference is inescapable that defendant waited for Milo to die for at least 20 minutes before he deliberately decided to finish her off. As it is unlikely that the passions of the jurors could be any more inflamed by defendant's nonfatal blow to Diane's jaw with a 40-ounce beer bottle than this manner of killing Milo, we conclude that there was no reasonable probability that defendant would have achieved a more favorable result had the trial court excluded the evidence.

14

## II. Constitutionality of section 1109

Defendant contends that section 1109 interferes with a criminal defendant's rights to equal protection, due process, and a fair trial, and he asks that we declare it invalid. We find no merit in defendant's arguments, and reject his constitutional challenge.

### A. *Due process*

As defendant recognizes, in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*), the California Supreme Court rejected a similar facial challenge to section 1108, which provides for the admission of evidence of propensity to commit sex crimes. The court held that "the trial court's discretion to exclude propensity evidence under section 352 saves section 1108 from defendant's due process challenge." (*Falsetta, supra*, at p. 917.)

Defendant contends that the protections afforded by section 352 are unreliable and inadequate to safeguard a defendant's right to due process under section 1109, and thus invites us to reject the holding of *Falsetta* that propensity evidence in general is not a per se violation of due process. Defendant also suggests that we adopt the reasoning of the Ninth Circuit Court of Appeals in *Garceau v. Woodford* (9th Cir. 2001) 275 F.3d 769, overruled on other grounds in *Woodford v. Garceau* (2003) 538 U.S. 202. We are not bound by decisions of the federal circuit courts of appeal, even with regard to federal constitutional questions. (*People v. Cleveland* (2001) 25 Cal.4th 466, 480.) On the other hand, as defendant also recognizes, we are bound to follow the majority opinions of the California Supreme Court, and do not have discretion to reject them. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Moreover, as our high court recently noted in reiterating that section 352 saves section 1108 from a due process challenge, "the federal courts follow an analogous rule. (See *U.S. v. LeMay* (9th Cir. 2001) 260 F.3d 1018, 1022 [upholding constitutionality of Fed. Rules Evid., rule 414, 28 U.S.C.].)" (*People v. Wilson* (2008) 44 Cal.4th 758, 797.)

Further, the courts of appeal have consistently applied the reasoning set forth in *Falsetta* to uphold the constitutionality of section 1109 against a due process challenge. (See, e.g., *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704, and cases cited therein, cited with approval in *People v. Wilson, supra*, 44 Cal.4th at p. 797.) "In short,

15

the constitutionality of section 1109 under the due process clauses of the federal and state constitutions has now been settled." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310 (*Jennings*).)

### B. Equal Protection

The courts of appeal have also repeatedly rejected equal protection challenges to section 1109. (See, e.g., *People v. Price* (2004) 120 Cal.App.4th 224, 240, and cases cited therein.) One such court applied the analysis of *People v. Fitch* (1997) 55 Cal.App.4th 172 (*Fitch*), which rejected an equal protection challenge to section 1108. (See *Jennings, supra*, 81 Cal.App.4th at pp. 1309-1313.) The *Fitch* court concluded that section 1108 did not violate equal protection because it bore a rational relationship to a legitimate state purpose based upon the Legislature's determination that "the nature of sex offenses, both their seriousness and their secretive commission which results in trials that are primarily credibility contests, justified the admission of relevant evidence of a defendant's commission of other sex offenses." (*Fitch, supra*, at p. 184, citing *Estelle v. Dorrough* (1975) 420 U.S. 534, 537-538.) In *Jennings*, the court drew on the analysis of *Fitch*, discerned a similar purpose in section 1109, as domestic violence is also a secretive crime resulting inevitably in credibility issues, and held that section 1109 also met the more relaxed scrutiny of a rational-basis analysis. (*Jennings, supra*, at p. 1313.)[4] We agree.

### III. Voluntary manslaughter jury instructions

Defendant contends that the trial court erred in denying his request for jury instruction CALJIC No. 8.40, which provides in relevant part: "There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion . . . ."

---

[4]    Although the California Supreme Court did not directly address the equal protection issue in *Falsetta*, it referred to *Fitch* and indicated its agreement with its analysis, and concluded: "As *Fitch* stated, 'The Legislature is free to address a problem one step at a time or even to apply the remedy to one area and neglect others. [Citation.]' [Citations.]" (*Falsetta, supra*, 21 Cal.4th at p. 918, quoting *Fitch, supra*, 55 Cal.App.4th at pp. 184-185; see also *Jennings, supra*, 81 Cal.App.4th at p. 1312, fn. 4.)

Malice is negated, and murder reduced to voluntary manslaughter, when the defendant kills "upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. (a).) "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201.) The facts and circumstances that would arouse the passions of an ordinarily reasonable person of average disposition must be viewed objectively. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143.)

"[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59.) Although the sufficiency of the provocation is measured by an objective standard, there is a subjective component. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) The subjective component is the defendant's state of mind, which requires a showing that he in fact acted in the heat of passion. (*Ibid.*)

The trial court must instruct the jury on this theory only when it is supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 156, 162.) Here, the trial court found insufficient evidence to justify giving the instruction. Defendant contends that the instruction was supported by the following evidence: defendant presented with a laceration and swelling on his forehead, bumps on either side of his head, and some bleeding from one of the bumps; the injuries were consistent with having been caused by the front end of a hammer; although the injuries appeared to be self-inflicted, they could have been the result of an assault; defendant showed signs of

17

intoxication; and defendant cried during his conversations with both Fender and Detective Rodriguez.

Defendant argues that the jury could have inferred provocation from such circumstances. He concludes that the evidence sufficiently showed that Milo hit defendant in the head with the hammer, thus provoking defendant, and upon this sudden quarrel, defendant hit Milo in the head, which resulted in her death. Defendant's arguments are not persuasive. There was no evidence, direct or circumstantial, that Milo ever touched the hammer or even knew that it was in defendant's room. It is only speculation that Milo delivered the hammer blows which caused defendant's injuries, and if so, under what circumstances, or even when she might have delivered them -- other than sometime before she was totally incapacitated by defendant's first blow to her neck. Without more, we do not agree with defendant that the jury could have been able to determine, by inference or otherwise, whether the provocation was sufficient to "cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*People v. Lee, supra*, 20 Cal.4th at p. 59.)

Moreover, since defendant did not testify, there was no other direct or circumstantial evidence of defendant's subjective state of mind, and thus no evidence that defendant in fact acted under a heat of passion. Defendant does not point to any such evidence or argue that there was substantial evidence of the subjective component. A trial court has no duty to give heat of passion instructions to the jury without evidence that the victim's conduct had some effect on the defendant's state of mind. (*People v. Manriquez* (2005) 37 Cal.4th 547, 585.)

We conclude that the trial court did not err in failing to give a voluntary manslaughter jury instruction. Regardless, any such error would have been harmless under the test of *Watson, supra*, 46 Cal.2d at page 836, as it is not reasonably probable that defendant would have obtained a more favorable result had it been given. (See *People v. Breverman, supra*, 19 Cal.4th at pages 177-178 [*Watson* test applicable].) Before hitting Milo in the head, defendant struck her on her neck near the clavicle, instantly incapacitating her for a period of at least 20 minutes before striking the final

18

fatal blow to her head.  We have already concluded that such evidence overwhelmingly supported the jury's determination that defendant killed Milo with premeditation and deliberation.  Based upon such evidence, and in the absence of any substantial evidence that defendant acted rashly or that Milo did anything that would have provoked an ordinary person of average disposition to act rashly, we conclude that there was no reasonable probability that defendant would have achieved a more favorable result had the trial court instructed the jury with regard to voluntary manslaughter based upon heat of passion.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ


We concur:



_____, P. J.
BOREN



_____, J.
HOFFSTADT

19