See Dissenting Opinion

Filed 2/10/21

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| ANTHONY HERNANDEZ, | |
| Plaintiff and Appellant, | E072444 |
| v. | (Super.Ct.No. CIVDS1820920) |
| STATE PERSONNEL BOARD, | OPINION |
| Defendant and Respondent; | |
| DEPARTMENT OF CORRECTIONS AND REHABILITATION, | |
| Real Party in Interest and Respondent. | |

APPEAL from the Superior Court of San Bernardino County. John M. Pacheco, Judge. Affirmed.

Castillo Harper and Michael A. Morguess for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Xavier Becerra, Attorney General, Chris A. Knudsen, Senior Assistant Attorney General, and Fiel D. Tigno and Kelsey Linnett, Deputy Attorneys General, for Real Party in Interest and Respondent.

Petitioner and appellant Anthony Hernandez was convicted of misdemeanor domestic violence after choking his girlfriend. The California Department of Correction and Rehabilitation (Department) then terminated him from his position as a correctional officer. The Department stated that, because of his domestic violence conviction, federal law prohibited him from carrying a firearm, which he needed for the job.

We must decide whether the Department acted reasonably in terminating Hernandez. It is undisputed that federal law makes it a felony to possess a firearm after being convicted in any court of misdemeanor domestic violence, which is defined in part as the use of physical force by "a person similarly situated to a spouse" of a victim. Disputed here is whether Hernandez was "similarly situated to a spouse" of his girlfriend, given that he had been dating her five or six months and did not share a permanent residence with her. We hold, in line with the federal case law, that the evidence is sufficient to support the Department's determination that Hernandez was "similarly situated to a spouse" of his victim under these circumstances. Accordingly, the Department acted reasonably in terminating him, and we affirm.

## I.  FACTS

Hernandez began a romantic relationship with the victim in May 2015. About five months later, on October 25, 2015, police responded to a call from the victim's home. The victim reported that, during an extensive fight that involved her locking herself in the bathroom and sending text messages seeking help, Hernandez had three times straddled her while she was lying on her back, placed both hands around her neck and lifted up and

down so "she could not breathe or talk." Upon his arrest, Hernandez told the police that "he and his girlfriend . . . have been together for approximately six months" and that he "lives with [her] for four to five days per week . . . ." The victim likewise said that Hernandez had been in an intimate dating relationship with her for about six months and "lives with her four to five days per week." Hernandez thereafter pled nolo contendere to a misdemeanor violation of Penal Code Section 273.5, which criminalizes the infliction of bodily injury on a spouse or cohabitant, or on another intimate partner who has had an "engagement or dating relationship" as defined in the Penal Code.

The Department then terminated Hernandez from his job as a Correctional Sergeant, stating that he was "unable to possess a firearm as a result of" section 922(g)(9) of title 18 of the United States Code (section 922(g)(9)). A correctional officer must be able to carry a firearm at work; his duties included preventing inmate escapes and capturing escaped inmates, as well as receiving, checking and issuing guns and ammunition.

Hernandez appealed to the State Personnel Board (Board). While the appeal was pending, the state Department of Justice sent the Department a notice that Hernandez was prohibited from possessing a firearm.[1] In addition, the federal Bureau of Alcohol,

---

[1] This notice was partially based on a domestic violence protective order prohibiting Hernandez from possessing a firearm for five years, an order the victim obtained following the October 2015 incident. However, that order allowed Hernandez to possess a firearm for "work purposes," so it was partially based on the state Department of Justice's interpretation of section 922(g)(9) as well.

3

Tobacco and Firearms issued an opinion letter stating that Hernandez was prohibited from possessing a firearm as a result of section 922(g)(9).

The administrative law judge granted Hernandez's request that his appeal be decided on the briefs without an evidentiary hearing. In its proposed decision, the administrative law judge stated that no material facts were in dispute, concluded that Hernandez was prohibited from possessing a firearm as a result of section 922(g)(9), and held that his termination was proper. The Board adopted the proposed decision. Hernandez then filed a petition for writ of administrative mandate with the trial court (see Code Civ. Proc., § 1094.5), which the court denied.

## II. DISCUSSION

*A. Standard of Review*

In a mandamus proceeding, we are not to disturb the penalty imposed on Hernandez unless the Department prejudicially abused its discretion. (*Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 217.) There is generally no prejudicial abuse of discretion if substantial evidence supports the Department's decision and the decision is correct as a matter of law. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514-515; Code of Civ. Proc., § 1094.5, subd. (b).) We must give the Department's decision the benefit of every reasonable inference. (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 46.)

*B. Section 922(g)(9)*

Congress enacted section 922(g)(9) in 1996 to "close [a] dangerous loophole" in the gun control laws. (*Voisine v. United States* (2016) 136 S.Ct. 2272, 2276, 2280.) Federal law banned felons from possessing firearms, but "many perpetrators of domestic violence are charged with misdemeanors rather than felonies, notwithstanding the harmfulness of their conduct." (*Id*. at p. 2276.) As well, "[f]irearms and domestic strife are a potentially deadly combination." (*Ibid.*) Accordingly, Congress created section 922(g)(9) to prohibit any person convicted of a "'misdemeanor crime of domestic violence' from possessing any gun or ammunition with a connection to interstate commerce." (*Voisine v. United States*, *supra*, 136 S.Ct. at p. 2276.)

Around the time of passage, only about a third of the states had a criminal statute (like Penal Code section 273.5 in California) that specifically proscribed domestic violence. (*United States v. Hayes*, *supra*, 555 U.S. at p. 427.) Domestic abusers were "routinely prosecuted under generally applicable assault and battery laws." (*Ibid*.) Consequently, Congress defined a "'misdemeanor crime of domestic violence'" to identify such crimes committed by "a person who had a specified domestic relationship with the victim." (*Id*. at p. 429.) To do so, it defined a crime of domestic violence as one involving the use or threatened use of physical force or a deadly weapon by (a) "a current or former spouse," (b) "a person who is cohabitating with or has cohabitated with the victim as a spouse," or (c) "a person similarly situated to a spouse . . . of the victim." (18

5

U.S.C. § 921(a)(33)(A)(ii).)  A person with such a conviction who possesses a firearm can be prosecuted for a felony under section 922(g)(9).

*C.  The "Similarly Situated to a Spouse" Caselaw*

This case does not involve a crime where the perpetrator fit either of the first two prongs of the federal definition of a domestic relationship.  Hernandez was neither a "current or former spouse" of the victim, nor was he a person cohabitating with (or having cohabited with) the victim "as a spouse."  Rather, we must examine the caselaw addressing the third category under the federal definition, which qualifies convictions where the perpetrator was "similarly situated to a spouse" of the victim.

Applying the "similarly situated to a spouse" prong, five federal appellate courts have held that an assault against a "live-in girlfriend" qualifies even absent any additional facts about the relationship.  That is, the cases do not require that the couple had a long relationship, shared finances, or intended to marry.  (*United States v. White* (11th Cir. 2010) 593 F.3d 1199, 1204 ["live-in girlfriend" constituted sufficient relationship because "she lived with him, was his 'girlfriend,' and the dispute was a 'domestic' one"]; *Buster v. United States* (8th Cir. 2006) 447 F.3d 1130, 1133 [victim was live-in girlfriend of unspecified duration, and "abuse perpetrated on a live-in girlfriend is domestic abuse committed 'by a person similarly situated to a spouse'"]; *United States v. Shelton* (5th Cir. 2003) 325 F.3d 553, 563 [affirming conviction where victim lived with the defendant for two months; because "'live-in girlfriend'" means "living together with the implication that the two were having sexual relations," the victim was "similarly situated to a

6

spouse"]; *United States v. Denis* (1st Cir. 2002) 297 F.3d 25, 31 [affirming conviction based only on fact of assault against live-in girlfriend]; *United States v. Slaughter* (9th Cir. 2005) 124 Fed.Appx. 542, 543 [victim was "'similarly situated to a spouse'" as girlfriend with whom the defendant was apparently cohabitating].)

With it firmly established that a live-in girlfriend of any duration is "similarly situated to a spouse," it is a strain to distinguish the relationship in this case. If Hernandez and his girlfriend spent four or five nights together weekly over five months, they would have spent perhaps 80 to 100 nights under the same roof. The question for us today is whether federal courts would distinguish such a relationship—where the couple has kept separate residences—from a relationship involving a live-in girlfriend. Does that difference make a couple not "similarly situated" to spouses for purposes of section 922(g)(9)?

Under one federal appellate case, such a distinction is not viable. In *United States v. Cuervo* (8th Cir. 2004) 354 F.3d 969, 997-998 (*Cuervo*), a defendant had been convicted of assaulting his secretary, with whom he had engaged in a long-term extramarital affair. (*Id*. at p. 997.) The defendant and victim had "stayed together periodically at an apartment [the defendant] kept." (*Ibid*.) But at the same time, the defendant "remained married and lived with his wife." (*Ibid*.) At trial, the issue of whether the defendant/secretary relationship qualified as domestic violence was a question for the jury, with the defendant attempting to establish that the relationship was not "'spouse-like.'" (*Id*. at 998.) The jury rejected that defense, and the appellate court

7

upheld that conviction. The court held that "[w]hile [the defendant's] victim was not his spouse, the evidence showed that she shared an intimate personal relationship with [him]. Thus, the jury was free to determine, as a factual matter, that she was in a position similar to a spouse. We will not disturb that finding." (*Ibid*.)

If the extramarital affair in *Cuervo* was sufficient to qualify as a domestic relationship, Hernandez's relationship here must be sufficient. In *Cuervo*, as here, the defendant did not share a permanent residence with the victim. But in *Cuervo* the defendant in fact lived with his spouse, rather than the victim. He stayed with the victim only "periodically." Under *Cuervo*, all that was necessary to sustain the conviction was that the defendant had an intimate personal relationship with the victim, and perhaps that he stayed with her at least periodically. Here, in contrast, Hernandez spent most nights with his girlfriend/victim, and he did not live with a spouse. It cannot be that *Cuervo* involved a relationship sufficient to be similarly situated to a spousal one, but this case does not. Considering *Cuervo*, the Department's determination that Hernandez cannot carry a gun was not merely supported, it was compelled.

In addition to *Cuervo*, at least three federal district courts have held that a defendant need not be sharing a residence with his girlfriend for the relationship to serve as a section 922(g)(9) predicate. (*United States v. England* (S.D. Ohio Oct. 6, 2014) 2014 U.S. Dist. LEXIS 141837 at *7 [where the defendant asserted that he and the victim maintained separate residences, § 922(g)(9) prosecution nevertheless may be sustained because "the case law suggests that the victim having lived with the defendant is not a

8

requirement"]; *Eibler v. Department of Treasury* (N.D. Ohio Jan. 30, 2004) 311 F.Supp. 2d 618, 622 [§ 922(g)(9) applies because "the fact that the two may not have been living together at the time of the assault is not dispositive" where the victim was a girlfriend with whom the misdemeanant had a long-time close and personal relationship]; *United States v. Cary* (N.D. Ga. Mar. 29, 2008) 2008 U.S. Dist. LEXIS 24953 at *6 ["There is no requirement that the defendant and victim ever lived together."].)  A fourth federal district court has grounded that view in the statutory text, reasoning that because those who cohabitate are covered by one clause of the domestic violence definition, the "similarly situated to spouses" clause covers relationships beyond cohabitation.  (*United States v. Heckenliable* (D. Utah April 13, 2005) 2005 U.S. Dist. LEXIS 6485 at *13 ["In dropping the word 'cohabiting' from the final clause, Congress apparently intended to sweep into the statute relationships that did not involve cohabitation.  Congress was no doubt concerned that some persons, while not habiting, might nonetheless remain in such frequent contact with each other that a risk of deadly violence would exist if firearms were present."].)[2]

---

[2] *White v. Department of Justice* (Fed. Cir. 2003) 328 F.3d 1361, which the dissent discusses (see dis. opn., *post*, at p. 2), involves uncontradicted evidence that the defendant had "continuous, complete cohabitation" with his victim for about ten months. (*White v. Department of Justice*, *supra*, 328 F.3d. at pp. 1369-1370.)  Thus, the case is primarily about the *second prong* of the statutory definition before us, which qualifies a conviction where the defendant cohabitated as a spouse.  *White* held the defendant's argument to be "almost frivolous," describing details about the relationship.  (*Id.* at p. 1369.)  It is true *White* found not only that defendant cohabitated "'as a spouse'" but also "at least similar to a spousal relationship" (*ibid.*), which means the evidence also was sufficient under the third prong that concerns us today.  But this backup holding cannot be read to tell us anything useful about the minimum necessary to satisfy the third prong.

This case law amply supports the Department's determination that Hernandez's domestic violence conviction precludes him from possessing a firearm under section 922(g)(9). We have not been presented with any case that holds that *any* state conviction is based on a relationship that fails to qualify as a predicate for section 922(g)(9), nor have we even been presented with authority that criticizes the opinions discussed above.

Under the existing federal case law, then, a domestic violence victim may be found "similarly situated to a spouse" so long as the couple has a sexual relationship that involves regularly spending the night together. There may well be some overnight relationship too fleeting to qualify; we would have reason to conclude that a single-night tryst is insufficient. But we do not have such a short-lived relationship here, as the undisputed evidence is that Hernandez spent most nights with his victim for at least five months. We thus do not have to determine whether there is *some* Penal Code section 273.5 conviction that would not serve as a section 922(g)(9) predicate. Notably, a trivial relationship does not even qualify under Penal Code section 273.5, which requires at a minimum a "dating relationship" involving "frequent, intimate associations."[3] Under the

More to the point are the five federal courts of appeals that have held (mostly after *White* was decided) that a romantic couple simply living together suffices to establish that the couple is "similarly situated" to spouses.

[3] Penal Code section 273.5 requires at a minimum a "dating relationship, as defined in paragraph (10) of subdivision (f) of section 243." That paragraph, in turn, defines dating relationship as "frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement independent of financial considerations."

10

federal law applied in immigration cases, in fact, a Penal Code section 273.5 conviction requires mandatory deportation because it is a categorial match for a similar federal definition to the one we apply here. (*Carrillo v. Holder* (9th Cir. 2015) 781 F.3d 1155 (*Carrillo*).)[4]

Our charge here is only to determine whether the Department abused its discretion in finding that Hernandez's relationship qualified for his domestic violence crime. The existing federal case law supports that determination. Not surprisingly, then, those who agreed with the Department's action included the state Department of Justice; the federal Bureau of Alcohol, Tobacco, and Firearms; an administrative law judge; and the trial court. We agree, find no abuse of discretion on this undisputed record, and affirm.

---

[4] *Carrillo* dealt with the version of Penal Code section 273.5 that existed before the 2013 amendments expanded it to include a "dating relationship." Thereafter, the Ninth Circuit Court of Appeals held in a non-precedential opinion that Penal Code section 273.5 is categorically a crime of domestic violence even after the 2013 amendments. (*Garcia v. Lynch* (9th Cir. 2015) 633 Fed. Appx. 887, 888 [holding "a 2014 conviction under California Penal Code § 273.5(a) is categorically a crime of domestic violence" and stating that *Carrillo* upheld a "materially similar" version of section 273.5(a)].) Even recently, the federal courts continue to hold in immigration cases that Penal Code section 273.5 is categorically a crime of domestic violence. (E.g., *Gonzalez Padilla v. Barr* (9th Cir. 2020) 830 Fed.Appx. 182, 185.) To succeed in showing that a section 273.5 conviction is not categorically a crime of domestic violence under federal immigration law, a noncitizen would have to show a "realistic probability" that a state conviction falls outside the federal definition, not a "theoretical possibility." (*Gonzalez v. Duenas-Alvarez* (2007) 549 U.S. 183, 193.) *Carrillo* is currently good law lending additional support to our determination as a state court construing federal law.

## III.  DISPOSITION

The judgment is affirmed.  The Department is awarded its costs on appeal.

CERTIFIED FOR PUBLICATION

RAPHAEL_____
                                                J.

I concur:

CODRINGTON_____
                         J.

[*Hernandez v. CA. State Personnel Board; CA. Dept. of Corr. and Rehab.*, E072444]

RAMIREZ, P. J.

I respectfully dissent.  In my view, there was insufficient evidence that Hernandez and the victim were "similarly situated" to spouses for purposes of the federal Gun Control Act.  (18 U.S.C. § 921 et seq.)  Even assuming there was sufficient evidence on this point, the administrative law judge (ALJ) did not make a factual finding that they were, and the evidence did not show that they were as a matter of law.

The issue is a matter of federal statutory construction.  We would be remiss if we did not look to federal cases for guidance.  Nevertheless, we sit at an appellate level in a parallel court system, and we are empowered to decide for ourselves what a federal statute means.  (*Thurston v. Midvale Corp.* (2019) 39 Cal.App.5th 634, 640.)

It is no surprise that federal courts have held that a live-in boyfriend or girlfriend is within the victim class under the Gun Control Act.  That victim class is defined as including a cohabitant, as well as a person similarly situated to a spouse.  (18 U.S.C. § 921(a)(33)(A).)  Thus, there is really no reason to even ask whether a live-in boyfriend or girlfriend — i.e., a cohabitant — is *also* similarly situated to a spouse.

Here, however, the victim was not Hernandez's live-in girlfriend.  The California Department of Correction and Rehabilitation (Department) expressly conceded below that they were not cohabitants.  The question, then, is what it takes for two non-cohabitants to be similarly situated to spouses.

Marriage connotes more than intimacy; it suggests some degree of commitment. The hallmarks of marriage — while not every one of them is necessarily present in every marriage — include sexual and romantic exclusivity, living together, sharing property, and pooling finances. Conversely, had Congress intended the victim class to include mere girlfriends and boyfriends, it would have been easy enough to use those words, or words like "regular sexual partner," or — as in Penal Code section 273.5 (section 273.5) — "dating relationship." The indicia of a spousal relationship were absent here.

*White v. Department of Justice* (Fed. Cir. 2003) 328 F.3d 1361 supports this view. It held that there was sufficient evidence that the perpetrator and the victim were either cohabiting or similarly situated to spouses where they had once lived together for about 10 months, later they spent about five nights a week together, and — significantly — they had "expectations of fidelity and monogamy, shared expenses, shared household responsibilities, social activities in common, and discussions about having children." (*Id.* at pp. 1369-1370.)

A case that presented a closer question was *United States v. Cuervo* (8th Cir. 2004) 354 F.3d 969 (*Cuervo*), cert. granted, judgment vacated on other grounds sub nom. *Schoenauer v. United States* (2005) 543 U.S. 1099 and sub nom. *Norman v. United States* (2005) 543 U.S. 1099, adhered to on this ground on remand, *United States v. Norman* (8th Cir. 2005) 427 F.3d 537, 538, cert. den. sub nom. *Norman v. United States* (2006) 547 U.S. 1084 and sub nom. *Schoenauer v. United States* (2006) 547 U.S. 1105. There, the victim was the perpetrator's secretary, and they "had engaged in a long-term

2

extramarital affair." (*Cuervo*, at p. 997.) They "stayed together periodically at an apartment"; however, the perpetrator "remained married and lived with his wife." (*Ibid*.) The court held that the evidence that they "shared an intimate personal relationship" was sufficient to support a finding that they were similarly situated to spouses. (*Id*. at p. 998.)

Cuervo acknowledged that the relationship must have the "defining characteristics" of marriage. (*Cuervo*, *supra*, 354 F.3d at p. 998.) It is distinguishable, because there, it was inferable that the perpetrator would have either married or cohabitated with the victim, but for the awkward fact that he already had a spouse. Thus, it does not support the proposition that there was sufficient evidence of a spouse-like relationship in this case, where such evidence of commitment is lacking. Even if it did, we should not follow it, because that would be inconsistent with the statutory text.

Separately and alternatively, even assuming there was *sufficient* evidence that Hernandez and the victim were similarly situated to spouses, the ALJ never made a *factual finding* to this effect. Rather, she ruled that the victim class under the Gun Control Act *necessarily* includes the victim class under section 273.5, so that a person convicted under section 273.5 is barred from possessing a firearm under the Gun Control Act as a matter of law. The trial court agreed. I do not.

As a matter of the "'ordinary, contemporary, common meaning'" of the words (see *Wisconsin Central Ltd. v. United States* (2018) ___ U.S. ___, ___ [138 S.Ct. 2067, 2074]), a "dating relationship" is not necessarily "spous[al]." "The definition of a dating relationship [in section 273.5] does not require 'serious courtship,' an 'increasingly

3

exclusive interest,' 'shared expectation of growth,' or that the relationship endures for a length of time. [Citation.] The statutory definition requires 'frequent, intimate associations,' a definition that does not preclude a relatively new dating relationship." (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1116.)

In *People v. Upsher* (2007) 155 Cal.App.4th 1311, the court held that there was sufficient evidence that the defendant was in a dating relationship with the victim. (*Id*. at pp. 1321-1324.) It noted that the victim was in the defendant's house at 4:30 a.m.; the defendant had a nickname for the victim; the defendant called her "'my lady friend' and 'my girl'"; the defendant said that he talked to her every night and she wrote to him every day; in the events surrounding the battery, both the defendant and the victim were highly emotional; when the defendant was arrested, he seemed to feel she had betrayed him; and the defendant told a person who tried to interfere with the battery to mind his own business. (*Id*. at p. 1323.) For the reasons discussed above, this would fall short of showing that the defendant was similarly situated to a spouse of the victim.

In the trial court, the Department argued that piggybacking the victim class under the Gun Control Act onto the victim class under state domestic violence statutes would make the federal law clear and easy for laypersons to obey. I might well agree. But that is not what Congress did. The Act does not incorporate state law. Its application does not vary from state to state, depending on how each state defines domestic violence.

In my view, then, even if I were to agree that there is sufficient evidence that Hernandez and the victim were similarly situated to spouses, the appropriate appellate

4

remedy would be to reverse and remand with directions to have the California State

Personnel Board make a factual finding on this point under the correct legal standard.

RAMIREZ           
P. J.