Filed 6/25/26  P. v. Andrews CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>MATTHEW LEE ANDREWS,<br>        Defendant and Appellant. | A173105<br><br>(Humboldt County<br>Super. Ct. No. CR2401763) |

A jury convicted Matthew Lee Andrews of two counts of domestic battery causing corporal injury (Pen. Code, § 273.5, subd. (a)).[1]  On appeal, Andrews challenges the sufficiency of the evidence that he was in a dating relationship with the victim.  He contends that without sufficient evidence of a dating relationship, both counts should be reduced to simple battery.  We affirm.

**BACKGROUND**

**I.    Procedural History**

The Humboldt County District Attorney charged Andrews by information with second degree robbery (§§ 211, 212.5, subd. (c)) and two counts of domestic battery causing corporal injury (§ 273.5, subd. (a)).  Each

_____

[1] Undesignated statutory references are to the Penal Code.

1

of the three charges involved the same victim. The information also alleged Andrews had personally used a dangerous or deadly weapon in one of the domestic batteries (§ 12022, subd. (b)(1)), and it alleged four aggravating factors.

Before submitting the case to the jury, the superior court dismissed the robbery count for insufficient evidence pursuant to section 1118.1 and the corpus delicti rule. The jury found Andrews guilty of both domestic battery counts, found true that he had personally used a dangerous or deadly weapon, and found not true the alleged aggravating factors. The court sentenced Andrews to four years in prison. Andrews timely appealed.

## II. The Evidence at Trial

### A. The September 27, 2023 Incident

On September 27, 2023, Kammi Loyd was working the night shift at the Grove, a housing facility owned by the nonprofit Arcata House Partnership. Near the Grove was an encampment known as "the pit." Around 9:40 p.m., Loyd heard "whimpering, kind of someone seeming in distress" coming from the direction of the pit. She also heard a woman's voice say loudly, " 'I've been fucking stabbed.' " The woman repeated the statement about having been stabbed at least five times. Loyd testified that the woman sounded "very distressed," and Loyd said she "could tell that she was hyperventilating."

Loyd called 911 and then encountered the woman, referred to at trial as Jane Doe, outside the Grove. Doe was clutching the top of her forearm, and her sleeve was bloody. Doe told Loyd that she had been stabbed. After administering aid, Loyd asked Doe who had stabbed her, and Doe responded, " 'My boyfriend.' " Loyd then asked for his name, and Doe identified Matthew Andrews. Loyd testified that Doe "kept repeating the same thing over and

2

over[,] that she couldn't believe this was done to her by him." Doe was later transported to the hospital, where she received eight staples and three sutures to close the wound.

Three days later, Officer Jared Ault of the Arcata Police Department arrested Andrews at the pit. When Officer Ault made contact with Andrews, Andrews and Doe were both inside a tent. Officer Ault testified that it appeared as though they both lived in the tent. Doe told Officer Ault that the incident had occurred while she and Andrews were fighting over a blanket and that it was an accident.

Several months later, Loyd saw Doe walking near the Grove with a man. Loyd's coworker commented that Doe was " 'with her boyfriend,' " but Loyd did not see who the man was.

**B. The May 26, 2024 Incident**

About eight months after the stabbing, on May 26, 2024, Doe called 911 from Carlson Park. She told the dispatcher, "My boyfriend punched me in my eye," and she identified her boyfriend as Matthew Andrews. Referring to Andrews with multiple obscenities, Doe said that she wanted Andrews arrested. Doe also said that she wanted a restraining order, commenting, "I'm goin' through with everything this time. Everything." Officer Efrain Sanchez, who responded to the 911 call, testified that Doe was "very distraught" and "crying" when he encountered her. He also observed "a red mark on her left cheek that was raised, much redder than the right side of her face."

On June 3, 2024, Officer Cameron Neff arrested Andrews at an encampment in Carlson Park. Andrews explained to Officer Neff that about one week earlier, he had taken $16 from Doe's wallet, that Doe had been

3

upset, and that he "didn't mean to but [he] punched her in the eye." Andrews added that he paid $20 back.

Doe did not testify at trial. The defense presented no evidence.

## DISCUSSION

Andrews' only argument on appeal is that there was insufficient evidence for the jury to find beyond a reasonable doubt that he was in a dating relationship with Doe, an element of the domestic battery counts, and that those counts should be reduced to simple battery as a result.

"In evaluating a claim regarding the sufficiency of the evidence, we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 712 (*Westerfield*).) " 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*Id.* at pp. 712–713.) " ' " "This standard applies whether direct or circumstantial evidence is involved.' " ' " (*People v. Zgurski* (2021) 73 Cal.App.5th 250, 261, quoting *People v. Thompson* (2010) 49 Cal.4th 79, 113.)

Section 273.5 provides: "A person who willfully inflicts corporal injury resulting in a traumatic condition upon a victim described in subdivision (b) is guilty of a felony." (§ 273.5, subd. (a).) Among other categories of relationships, subdivision (b) includes "someone with whom the offender has, or previously had, a[] . . . dating relationship, as defined in paragraph (10) of

4

subdivision (f) of Section 243." (§ 273.5, subd. (b)(3).) That provision, in turn, defines " '[d]ating relationship' " as "frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement independent of financial considerations." (§ 243, subd. (f)(10).) This definition "does not require 'serious courtship,' an 'increasingly exclusive interest,' 'shared expectation of growth,' or that the relationship endures for a length of time," but it does contemplate something more than " 'a casual relationship or an ordinary fraternization between [two] individuals in a business or social context.' " (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1117.)

Andrews argues that there is insufficient evidence of a dating relationship. Specifically, he argues that Doe's references to him as her boyfriend, together with evidence that they were seen together up to four times between September 2023 and May 2024, does not satisfy the statutory definition, particularly where there is "no evidence of any physical intimacy and scant evidence of emotional intimacy." Drawing all reasonable inferences in favor of the verdict, we conclude that the evidence was sufficient for the jury to find that Andrews and Doe were in a dating relationship.

The Fourth District's opinion in *People v. Upsher* (2007) 155 Cal.App.4th 1311 (*Upsher*) is instructive. Similar to Andrews' arguments here, Upsher contended that his references to the victim as " 'my lady friend' " or " 'my girl' " were insufficient to infer a dating relationship, including because there was no evidence of the duration of the relationship or "what they expected of one another." (*Id.* at p. 1321.) Our colleagues held that the evidence of a dating relationship was sufficient. (*Id.* at p. 1323.) The victim was at Upsher's house at 4:30 a.m., and when a security guard confronted Upsher during the incident, Upsher responded that the guard

5

should mind his own business, "permitting the jury to reasonably infer that the matters between Upsher and [the victim] were private, personal matters, not events between social acquaintances in an ordinary context." (*Id.* at pp. 1323, 1316.) Both Upsher and the victim were highly emotional, including yelling obscenities, during the incident. (*Id.* at p. 1323.) An officer testified that "Upsher called out to [the victim] using a nickname, 'You're going to do me like this, Tecia,' indicating familiarity between the two and Upsher's feeling of betrayal." (*Ibid.*) Finally, Upsher referred to the victim as " 'my lady friend' " and " 'my girl,' " and he testified that he communicated with her daily. (*Ibid.*)

Here, Doe referred to Andrews as her boyfriend immediately following both incidents, which occurred eight months apart. The jury could reasonably have inferred Doe had interpreted the term "boyfriend" as it is commonly understood: "a frequent or regular male companion in a romantic or sexual relationship" (Merriam-Webster.com Dictionary, "boyfriend" <https://www.merriam-webster.com/dictionary/boyfriend> [as of June 10, 2026]), or a "male with whom a person has a romantic or sexual relationship; a male partner or lover" (Oxford English Dictionary, "boyfriend" (noun, sense 2) <https://doi.org/10.1093/OED/1151490811> [as of June 10, 2026]). Doe's consistent references to Andrews as her boyfriend thus supported the existence of a dating relationship as defined by the Legislature. (See *Upsher*, *supra*, 155 Cal.App.4th at p. 1323 [evidence of dating relationship included defendant's references to victim as " 'my girl' " and " 'my lady friend' "].)

There also was evidence that Doe repeatedly expressed shock that Andrews had stabbed her, from which the jury reasonably could have inferred that Doe felt betrayed by someone with whom she had an intimate,

trusting relationship. (See *Upsher, supra*, 155 Cal.App.4th at p. 1323 [expression of feeling of betrayal evidence of dating relationship].)

Similarly, Doe was highly emotional following the second incident, referring to Andrews as a "piece of shit" and a "motherfucker" during the 911 call that was played to the jury. (See *Upsher, supra*, 155 Cal.App.4th at p. 1323 [evidence of dating relationship where both parties were highly emotional and shouting obscenities during incident].) Doe also said she wanted a restraining order, commenting that she was "goin' through with everything this time," which the jury could have viewed as evidence Doe's relationship with Andrews was more than that of a casual acquaintance. Specifically, the jury could have inferred from these comments that Doe did not pursue charges or a restraining order against Andrew after the first incident because she still trusted and felt safe with him, but that that was no longer true after the second incident. Andrews suggests Doe instead was upset due to her injuries or the property disputes, but where "different inferences can be drawn from undisputed facts, we must accept the lower court's inference" unless it is "rebutted by clear, positive and uncontradicted evidence." (*M.A. v. B.F.* (2024) 99 Cal.App.5th 559, 570 (*M.A.*).) Andrews has not met that standard here.

Officer Ault's testimony that it appeared Doe and Andrews lived together in the tent further supports the existence of a dating relationship. Andrews makes two related attacks on this testimony. First, he argues that "there is absolutely no evidence to support" the conclusion that Doe and Andrews lived together. That is not so. Although it was limited, there was evidence supporting Officer Ault's conclusion. The jury heard evidence that Doe and Andrews were fighting over a blanket at 9:40 p.m. before the stabbing, which is consistent with them living together. Officer Ault also

7

testified that he found Andrews and Doe together in the tent three days after the stabbing, which is consistent with cohabitation.

Second, Andrews contends that because Officer Ault did not testify to the facts underlying his opinion, the jury was required to reject the opinion as "purely speculative." But, as Andrews concedes, Evidence Code section 800 permits lay opinion testimony that is "(a) [r]ationally based on the perception of the witness; and [¶] (b) [h]elpful to a clear understanding of his testimony." "For example, testimony that another person was intoxicated [citation] or angry [citation] or driving a motor vehicle at an excessive speed [citation] conveys information to the jury more conveniently and more accurately than would a detailed recital of the underlying facts." (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547 (*Chapple*).)

Andrews does not dispute that Officer Ault personally observed the interior of the tent or contend that forming an opinion about whether Doe and Andrews lived there required specialized knowledge. (See *People v. Phillips* (2022) 75 Cal.App.5th 643, 682 [subject matter of lay opinion must be " " 'one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness" ' "].) Instead, he asserts that the opinion is of no value because Officer Ault did not describe specific observations supporting his opinion. He cites no authority requiring specific observations. Moreover, such a requirement would conflict with the Supreme Court's observation in *Chapple* that lay opinion testimony is useful precisely because it "conveys information to the jury more conveniently and more accurately than would a detailed recital of the underlying facts." (*Chapple*, *supra*, 138 Cal.App.4th at p. 547.) Officer Ault's testimony that Doe and Andrews appeared to live together thus supports the finding of a dating relationship.

Finally, there was circumstantial evidence from which the jury reasonably could have inferred that Doe and Andrews held themselves out to the community as boyfriend and girlfriend. Loyd testified that several months after the first incident, when she and a coworker saw Doe walking with a man, the coworker commented that Doe was "with her boyfriend." Andrews correctly observes that Loyd did not identify Andrews as the man walking with Doe. Still, a jury reasonably could have found the evidence tended to support the existence of a dating relationship, given that Doe referred to Andrews as her boyfriend in the months before and after the sighting Loyd described and the lack of any evidence Doe dated anyone else during that time.

Andrews argues that the record here contains less evidence of a dating relationship than *M.A.*, *supra*, 99 Cal.App.5th 559, where our colleagues in the Fourth District affirmed the trial court's finding of no dating relationship. In *M.A.*, the trial court determined that a " 'friends with benefits' " relationship did not constitute a dating relationship under Family Code section 6210, which uses the same definition as Penal Code section 243, subdivision (f)(10). (*M.A.*, at p. 562.) The evidence included that M.A. and B.F. saw each other in person eight times over 19 months; that while some of their encounters were sexual, they did not spend time together after having sex; that B.F. often declined M.A.'s invitations to get together; and that M.A. sent B.F. messages on social media, to which he often responded with a single word. (*Id.* at pp. 563–565, 571.)

Drawing all reasonable inferences in favor of the judgment, the Fourth District held that substantial evidence "permitted the court to reasonably draw an inference that M.A. and B.F. had a casual relationship marked by brief, sporadic sexual 'hook ups,' lacking the 'emotional and privacy aspects'

9

[citation] or the 'emotional and affectional involvement' [citation] that mark frequent, intimate associations." (*M.A.*, *supra*, 99 Cal.App.5th at pp. 571, 576.) That does Andrews little good here, where Doe described Andrews as her boyfriend, the record contains no suggestion the relationship was anything other than what Doe said it was,[2] and—contrary to *M.A.*—we must draw inferences in favor of the existence of a dating relationship. (See *Westerfield*, *supra*, 6 Cal.5th at p. 712.)

## DISPOSITION

The judgment is affirmed.


TUCHER, P. J.


WE CONCUR:

PETROU, J.
RODRÍGUEZ, J.

---

[2] Andrews argues for the first time in his reply brief that the disputes over the blanket and $16 constitute "financial considerations," bringing the relationship outside the definition of "frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement *independent of financial considerations*." (§ 243, subd. (f)(10), italics added.) We need not consider arguments raised for the first time in a reply brief. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 548.) Even if we were to consider this one, Andrews cites no authority for the proposition that a single dispute about money would remove a relationship from the statutory definition of dating relationship—an outcome we find unlikely.

10